AUTOPIANO CO. v. AMPHION PIANO PLAYER CO.

(Circuit Court of Appeals. Second Circuit. March 15, 1911.)

No. 199.

**1. PATENTS (§ 328*)—INFRINGEMENT.**

The O'Connor patent, No. 789,053. for a web-guiding device, is not for a pioneer invention, but for an improvement on prior devices regulating the lateral displacement of note sheets in musical instruments, the defects of which the patentee sought to correct by substituting surface control of the sheet for edge control, which, as stated in the specification, was objectionable because the edges of the sheet were thereby injured; and, in view of such statements, of the prior art, and of the proceedings in the patent office, the patent cannot be construed to cover an edge-controlled device. As so limited *held* not infringed.

**2. PATENTS (§ 234*)—INFRINGEMENT.**

A patent for the very character of device which a prior patentee had rejected as objectionable and sought to avoid, as shown by his specification. carries with it a strong presumption that the later device is not an infringement of the earlier patent.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 234.*]

**3. PATENTS (§ 173*)—"PIONEER PATENT."**

A pioneer patent is one covering a function never before performed, a wholly novel device, or one of such novelty and importance as to make a distinct step in the progress of the art as distinguished from a mere improvement or perfection of what had gone before.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 248; Dec. Dig. § 173.*

For other definitions, see Words and Phrases, vol. 6, p. 5380.]

Appeal from the Circuit Court of the United States for the Southern District of New York.

Suit in equity by the Autopiano Company against the Amphion Piano Player Company. Decree for defendant, and complainant appeals. Affirmed.

The following is the opinion of Hand, District Judge, in the court below:

I agree with the complainant that there is nothing shown in this patent to justify any challenge of its patentable novelty, and that complainant's Exhibit 3 would have been an infringement of the patent had it not been for the license which O'Connor had given to the defendant at the time when the only machine of the kind is proved to have been sold. The real issue between the parties, however, is whether complainant's Exhibit 4 comes within the scope of the patent. It must be conceded that, at first blush, the variation of Exhibit 4 has every indication of being colorable, designed merely for the purpose of avoiding the effect of the patent. Nevertheless, the purpose of the defendants is irrelevant, if the actual structure does not infringe the claims. The question is simply of the reasonable scope of the invention, which may be gathered from the patent itself, from the state of the art when it appeared, and from an analysis of the file-wrapper in the Patent Office. I shall therefore take up in this order these three means of ascertaining the intention of the patentee.

The patentee states the general objects of his invention on page 1, lines 9–21, and from these it appears that it is not merely to obtain an automatic regulation for a sheet or web, but that the object of the invention is to do this "by means of the margins of the sheet or web itself, without any perforation or cutting, or other special preparation of the sheet. and without in any way injuring the edges of the most delicate or fragile fabric." It should

be noted, therefore, that in stating in most general terms the object of his invention the patentee distinguishes between the margins which are to regulate the sheet, and the edges, injury to which, even of the most delicate fabric, the patent will avoid. Proceeding upon the same page, from lines 37 et seq., he speaks of the "serious and well-recognized difficulties" which have been experienced in the art of maintaining the proper position of a sheet of paper, and particularly that the devices formerly used were unsatisfactory, because the edges of the paper or fabric became injured. He adds (page 1, lines 55–61): "Hence the objection to employing for thin webs, and especially for those which have to be run through repeatedly these centralizing devices, the operation of which is inaugurated by physical or forcible contact with the leading edge of the web as the latter shifts sidewise." The difficulties so raised he claims to avoid in his invention by devices which will "be automatically actuated by the lateral deflections of the web, which, when in its normal or central position, serves to hold the web-guiding or centralizing devices out of operation, and which by its divergence to one side or the other, allows the appropriate guiding or centralizing devices to come into operative contact." Page 1, lines 95–98; page 2, lines 1–4.

At the outset, therefore, it appears expressly that the general object of the invention is to avoid edge control, especially in "thin webs," "which have to be run through repeatedly," and that this control the patentee means to replace through a control by means "of the margins of the sheet or web itself without any perforations." It cannot after this preamble of the patent be said truly that edge control is an equivalent of the surface control, which is what he means by "margins," as is disclosed later in the patent. That is not an equivalent which is particularly repudiated in the broadest terms, and the avoidance of which is a part of the very object of the patent. I am, of course, assuming that the description and the claims are consistent with the preamble, as I shall now try to show.

The figures and descriptions in the patent which follow the preamble all show structures which not only operate by surface control, but cannot operate in any other way. Following them are 20 claims upon the meaning of which this case turns. Of these the complainant concedes that only six have any bearing on Exhibit 4. These are Nos. 5, 10, 15, 16, 19, and 20. Of the others the first four, and the sixth, seventh, and eighth clearly include surface control only, and are limited in that respect closely to the actual disclosure. The eleventh, twelfth, and thirteenth are variations of the tenth claim, and the seventeenth and eighteenth variations of the sixteenth claim. The ninth claim is somewhat similar to the fifth, because the words "means, normally held out of operation," are substantially equivalent to "means, maintained in inoperative condition" in claim 5 (Fowler's testimony, XQ. 131). The fourteenth claim is of a different character, and does not affect this problem. It is clear enough, therefore, that some of the claims can only be read upon surface control, and the question will be whether there is a sufficient indication of a different intention in the claims in suit.

The fifth claim, which is the first in suit, is as follows: "The combination, with a traveling sheet or web, of a tracker-bar, and means, maintained in inoperative condition by the sheet when in its normal position, for restoring the normal relation of the sheet and the tracker-bar when uncovered by the edge of the sheet." Exhibit 4 shows the traveling sheet or web, the tracker-bar, and means for restoring the normal relation of the sheet and the tracker-bar when uncovered by the edge of the sheet. Although the disclosures indicate by these words that this is to be done directly, the mere interposition of a lever certainly does not remove it from the range of equivalents. The remaining element of the combination is found in the words: "Maintained in inoperative condition by the sheet when in its normal position." In Exhibit 4 the sheet in its normal position maintains nothing. So far as the restoring means goes, it might be wholly removed, and nothing would happen. The complainant's expert, Fowler (folio 164) says: "The position of the sheet is the factor which determines the condition of operativeness or inoperativeness of the adjusting means." This is mere sophistry. All that he and the expert Browne can in fact truthfully say is that, when the sheet is in normal position, its movement to abnormal opens the guide-openings; and, when it

moves back, it closes the guide-openings. That is a very different thing from saying that, when it is in normal position, it maintains the means inoperatively. There would be as much reason in saying that the axe which fells a tree has all along maintained it upright. Now, no element of the combination may be omitted in the interests of the patent. It is as much a part of the patent that the means shall be inoperatively maintained by the sheet, as that there shall be a tracker-bar or a web. These words aptly describe what I have called surface control, and there is nothing else disclosed or suggested which they can mean. The issue is irrelevant whether or not the removal of the sheet in figures 1 or 3 of the patent in suit would leave them "in inoperative condition," though much evidence was taken upon it. It is quite clear that the patentee must be understood as so understanding it, else he could not have spoken of the "inoperative condition" as being "maintained by the sheet."

The next claim is No. 10, which reads as follows: "In combination with mechanism employing a traveling sheet or web, a tracker provided with a guide-opening, arranged to be closed by the sheet, when the latter is in its normal position, means for propelling the sheet across the tracker, and pneumatic devices governed by the guide-opening for adjusting the relation of the tracker and the sheet-propelling means when the opening is uncovered." Exhibit 4 shows the traveling sheet and web, the tracker provided with the guide-openings, means for propelling the sheet across the tracker, and pneumatic devices governed by guide-openings for adjusting the relation of the tracker and the sheet and propelling means when the opening is uncovered. However, the guide-opening is not "arranged to be closed by the sheet when the latter is in its normal position." The language here is plainer than in claim 5, because the claim is more specific. No fair interpretation of the words permits the statement that the guide-openings in Exhibit 4 are arranged to be closed by the sheet, when the latter is in its normal position. Here, again, the expert Fowler evades the question. He says; "The covering and uncovering of the guide-openings is determined by the lateral deflection of the note-sheet. In the structure of the patent the note-sheet is the active agent in closing the guide-openings." Folio 172. The expert Browne says (folio 1289): "The point of the claim is that the note-sheet may occupy a normal and an abnormal position, and that the result of the movement from normal to abnormal position is to open the guide-opening, and the contrary movement closes it." Here, also, these gentlemen confuse the action of the web in moving from an abnormal position, with the statement in the patent, which is that the sheet closes the guide-opening when it is at rest. Whether it be an important difference or not, there cannot be the least doubt that it is one thing to close the means by the movement of the sheet, and another to close it by its immobility. That the importance is great is here also shown by the fact that this describes, and under the disclosures can only describe, surface control, which, as the prior art will show, is the only control which could be closed by the sheet when in normal position.

Claim 15 is as follows: "In combination with mechanism employing a traveling sheet or web, a tracker provided with an adjustable guide-opening." This claim verbally reads upon Exhibit 4. I shall not consider it until later.

Claim 16 is like claim 10, except that the combination is stated to be in an "automatic musical instrument." It is subject to the same objections as claim 10, and there are therefore only two claims, 5 and 10, which it is important to consider here. In both of these, as I have shown, the claim reads upon a device for surface control, and not upon a device for edge control; at least, not under the disclosures, and, as will subsequently appear, not under the prior state of the art. The surface control, as I have already shown, is especially pointed out in the patent as one of the advantages of the patent, and the patentee claims it as such. There is nothing within the four corners of the patent anywhere to suggest that he conceived his patent when applied to sheets in combination with tracker-bars, as having both edge and surface control. Nor is there the least reason to suppose that he contemplated two patents: One, for surface control for traveling webs with or without trackers; the other for the combination of web and tracker with restoring means, whether or not they operated by surface or by edge control. That

there is no color for a contrary contention will appear more fully when the file-wrapper is considered.

So much, therefore, for the patent itself. In the prior art at the time that the application was filed, the relevant patents are not many. Paper machines had long been used, and consisted of rollers upon which a web of pulp had to travel. This web frequently got out of adjustment, and the patents cited were for the purpose of re-establishing the alignment of the web, Hutton, 140,418, Barry, 260,356. Smith, 339,703, and Smith, 362,674 were all machines for this purpose and were all designed upon the same theory, which was to re-establish the normal position of the web by tilting one end of the roller higher than the other, thus causing the web to run askew, and so to move along the roller itself. This tilting was effected by a mechanism set in operation as soon as the edge of the web touched it on either side, if the web ran sidewise upon the bar. It is not necessary to enter into the details of these inventions. They are relevant for this purpose only to show that the re-establishment of the normal position of a traveling web by edge control automatically acting upon the roller itself was known in 1873. Of course, none of these patents touched automatic musical instruments, or the combination of web and tracker.

More closely relevant are the two patents of Cottrell, 477,352, and Lyon, 642,141. Each of these applies likewise to a traveling sheet or web, and was primarily designed, unlike the other patents, for printing presses. The divergence of the sheet from the normal position in both cases by forcible contact moves a pendant arm aft. If moved enough, this arm, which is one pole of an electric current, touches, or breaks from, another arm, constituting the other pole, and, when the current is established or broken, it sets in motion a restoring mechanism, which, in the case of Cottrell, shifts the roller itself laterally into normal position, and, in the case of Lyon by a skew roller, shifts the sheet upon the roller. Both Cottrell and Lyon would read upon the first three claims of the patent in suit, were the word "edge" substituted for the word "surface"; and, if claims 5 and 10 contemplate edge control, they differ from either Cottrell or Lyon only by the fact that the combination is of a tracker-bar with a traveling sheet.

Of specific inventions to regulate the lateral displacement of note-sheets on musical instruments there is only one, which is Clarke, 625,744. This was a device for accomplishing precisely the same result as the patent in suit, but it was not automatic. By means of a thumb-screw the tracker could be shifted laterally, and the openings in the tracker be preserved in proper registration with the note-sheet. It had various disadvantages, one of which was that it took some time to perform it, during which the discords so produced must continue. It differed from Cottrell and Lyon, however, in that there was no fixed proportion between the degree of lateral restoration and the movement of the sheet.

Two other inventions adapted to musical instruments are Tremaine & Pain, 552,796, and Fleming, 621,963. Both of these operated by surface control, but they were designed to establish, not lateral, but longitudinal, adjustment. They were to keep in synchronism two simultaneously moving rollers, and so to play a harmonious duet. The first operated by a double bellows through a most complicated mechanism. It is relevant to the patent in suit only as showing surface control through the uncovering by the sheet of apertures in the tracker-bar, and the connection of these apertures with a supplementary bellows so adjusted as to uncouple the driving clutch of either roller and so to arrest it, till the other had established with it proper synchronism. Fleming operates through the surface of the sheet by means of electric contact points and magnets. In this respect it is analogous to figure 2 of the patent in suit, as Tremaine & Pain is to figures 1 and 3. In these patents, also, it should be observed that there is no fixed proportion between the degree of the restoration effected and the movement of the sheet. I mention this because the complainant somewhat relies on it as showing novelty, though it is hard to see why. O'Connor nowhere suggests that feature as an element of his patent, and his disclosure in figure 3 directly contradicts it, because in that machine the correction depends directly upon the progress of the "take-up" roll, just as in Cottrell, Lyon, or any of the earlier edge control patents.

This shows that there remained open for invention the following possibilities: Automatic control of moving webs without trackers, by their surface; automatic control of webs with trackers, by surface or edge. No one, I think, would contend that it was invention to adapt the automatic control of web and tracker to a musical instrument, especially as the common instance of such web and tracker was in automatic musical instruments. O'Connor invented lateral surface control for webs both with and without trackers. There remained, therefore, open to him as an unclaimed possibility edge control for webs in combination with tracker; and the sole question here is whether his claims may be expanded to include that, although he does not differentiate the application of his invention to the web alone from its application to the combination of web and tracker. In saying this I am assuming that the idea of Cottrell, if applied to web and tracker, would have constituted an invention in itself, which it seems to me would have been the case. The reason why his claims when limited to a combination of web and tracker should not be so expanded is simply the entire absence of any indication that he had the edge control in mind, together with the positive limitations contained in the patent itself of all the invention to surface control. It is, of course, not enough to justify the expansion of claims that the claims might have been expanded without losing patentable novelty, nor does it make any difference whether the patentee did not think of the application which he omitted, or whether, having thought of it, he supposed it would not be a valid, or practical, invention, and so voluntarily abandoned it.

To meet the difficulties in the patent itself, the complainant urged that his invention should be regarded as a pioneer. In support of this he says quite truly that he was the first to make possible an 88-note piano player. Theretofore, it had been possible practically only to make a 65-note player within manageable limits of the art. The deviations which were inherent in an unregulated note-sheet were so great as only to admit an aperture of one sixty-fifth of the total length of the note-sheet, and to reduce the aperture to one eighty-eighth resulted in discords. The question is whether this constituted a "pioneer invention." That phrase does not admit of exact definition, but perhaps as good as any is that of Mr. Justice Brown in Westinghouse v. Boyden Power Brake Co., 170 U. S. 537, 561, 562, 18 Sup. Ct. 707, 718, 42 L. Ed. 1136, where he says that a pioneer patent must be one "covering a function never before performed, a wholly novel device, or one of such novelty and importance as to mark a distinct step in the progress of the art, as distinguished from a mere improvement or perfection of what had gone before."

In this case the function had been performed before. It was performed, though not automatically, by Clarke in the patent which has been mentioned, and it was performed from the outset automatically, though imperfectly and inadequately, by the rollers of automatic musical instruments. I refer to the fact that all such rollers have flanges at either end, which are designed to keep, and do keep, the web in lateral adjustment, and so keep them in registration with the tracker, though they do so well enough only to allow of a 65-note sheet. The fact that these flanges did not permit of an accurate enough control to allow an 88-note player does not meet the fact that they were used, just as Clarke's patent was used, to accomplish this very function, and they did perform it, within limits.

Nor is it true that O'Connor's was a wholly novel device, which is the second suggestion of Mr. Justice Brown. Perhaps surface control was a new device at least when used to control lateral deviations, but edge control was not a new device to control such deviations, at least as shown in Cottrell. O'Connor does not claim the pneumatic means as new in the art, and, as I have shown, his invention, whatever it might have been, did not include restoration means operating out of relation to the forward movement of the sheet.

Finally, not only was the device not wholly new, but it was not one of such novelty or importance as to mark a distinct step in the progress of the art as distinguished from a mere improvement or perfection of what had gone before, because the result was precisely an improvement or perfection upon the flange control, as I have said. Or it may be stated as an automatic adjustment of the device of Clarke, as shown by Tremaine & Pain

and Fleming. I do not mean to suggest that to combine together these elements was not a meritorious and excellent invention, for I think it was, nor that it did not require real inventive skill, and was not patentably novel. All that, however, does not make it a "pioneer," unless it takes its place at the head of the art in means or result, which this patent does not. In one sense, it is, of course, true that any invention must be a distinct step in the progress of the art, but the pioneer step must be in a new direction, not along the path already indicated by what has gone before. Moreover, even in the case of a pioneer patent, the claims cannot be expanded so as to cover devices which are clearly excluded, and, as I have already tried to show, the language of the specifications coupled with the claims themselves do not admit of the necessary expansion without disregarding the express limitations which O'Connor chose to impose upon himself for whatever reason that may have been.

The third method of approach is to consider the file-wrapper itself. Of course, in considering the file-wrapper, the authorities repeatedly hold that the clear meaning of the claims cannot be limited by what took place in the Patent Office. On the other hand, it is the constant practice of courts in the interpretation of the language found in the patent to consider the estoppels arising from the file-wrapper as a legitimate method of interpreting the intent of the patentee. It is quite true that claims 5 and 10 were not substantially changed at any time in their course through the Office, but it does not at all follow from that that the statements of the patentee in relation to claims which were challenged may not be relevant, where the language used in the unchanged claims is substantially the same as the language in respect of which his statements were made, which is the case in this patent. As originally presented, claims 1, 2, and 3 were four in number, of which the first three concerned only the rectification of a traveling sheet, without tracker. Against them were at once cited Cottrell and Lyon, in the action of August 16, 1900. To meet the objection, O'Connor might have changed those claims alone, and as to his other claims have relied upon the novelty of the application of Cottrell and Lyon to a sheet in combination with a tracker. This, however, he did not do, but amended his specifications generally by the insertion already quoted of lines 55–61 on page 1, and of lines 96–98 on page 2. These words limited the scope, not alone of the first three claims, to which objection had been made, but of the whole patent, making clear that he conceived his invention to consist in avoiding edge control. His remarks also in the same communication of January 18, 1901, leave no doubt of his own interpretation of the effect of these words and of his conception at that time of his invention as limited to surface control. Thus he says: "The citations from the prior art are typical examples of the objections which are sought to be obviated or remedied by the present invention. The pendant rods O and O' of Cottrell and the lever of Lyon are, when brought into operation, pushed aside by physical contact with the web. * * * The edge of the paper continues to rub against the rods or levers, which are liable to tear or turn over the edges of the web, before the latter is restored to place. This might not be objectionable for some uses, particularly where the paper is run through the machine only once, as in printing machines and in paper bag machines, or where the paper is thick and strong. But where the paper is thin or delicate, and especially where the same paper is required to run repeatedly through the machine, as in the case of automatically operated musical instruments, and similar machines, the use of such a means or levers resting against the edges of the paper is undesirable. This would be particularly true in case of the perforated paper webs employed as note-sheets, in which it frequently happens that a longitudinal series of perforations lies near to the edge so that the latter would very easily be turned over edgewise by such devices as those of the references."

The changes in the specifications and these remarks seem to have satisfied the examiner as to claims 1, 2, and 3, but he still objected to the word "interposition" as used in the first four claims, in the action of February 5, 1901, especially in view of figures 1 and 3 of the specifications. To meet this objection, in his communication of March 30, 1901, the patentee changed the word "interposition" to "surface," and in the accompanying remarks he said: "This invention resides not in the form, arrangement or any other

peculiarity of these 'contact devices,' either electrical or pneumatic, but in 'devices for guiding or restoring the web to its normal position' when provided with either of these well-known forms of contact means when 'held out of operation by the interposition of the web.' " We have here an explicit statement that the invention "resides" in the. fact that the restoring devices shall be held out of operation by the web, which can only mean surface control. There is no suggestion that in some forms of the invention, not covered by claims 1 to 4, it may "reside" in other combinations, no limitation of this general language, but a statement apparently meant to apply to the invention in all its forms. He further concludes the same communication as follows: "In claim 1, however, he (O'Connor) has yielded to the preference of the examiner, and substituted the word 'surface,' thus clearly expressing a characteristic feature, in which all the present devices differ from those of the patents previously cited, which operate to push the guiding devices into operation by the action of the edges of the web." Here, again, the patentee clearly shows that the differentiation of claims 1, 2, and 3 from the citations made applies to all his devices, and not simply to those in which the web is not in combination with the tracker.

This disposes of all the claims except claim 15, which reads as follows: "In combination with mechanism employing a traveling sheet or web, a tracker provided with an adjustable guide-opening." The question here is as to the "adjustable guide-opening." When originally presented on November 12, 1901, this claim was followed by claim 16, which reads as follows: "The combination in an instrument of the class specified of a tracker provided with a guide-opening and means for adjusting the said opening laterally of the sheet." This was at once objected to by action of November 21, 1901, upon the ground that the drawings did not show any means for lateral adjustment. To this objection, on November 29, 1901, O'Connor responded by an argument, which, I must confess, seems to me quite conclusive of the validity of the claim. He showed that a swivel adjustment, such as was the only possible alternative of lateral adjustment, would have been inefficient for the obvious purposes of any adjustability whatever; but the examiner repeated his objection, and, although there was talk of an appeal in O'Connor's communication of August 13, 1903, no appeal was ever taken and the rejection of the claim stood. In view of this, therefore O'Connor on well-recognized principles of law assented to the examiner's ruling that the specifications did not disclose lateral adjustment, which is the only kind of adjustment provided in Exhibit 4. Claim 15 does not specify lateral adjustment, but it seems clear that, when O'Connor assented to the rejection of a specific claim for lateral adjustment, he cannot insist upon that by way of construction of claim 15 which will include implicitly and by interpretation what had been expressly disallowed. Therefore no fair intendment of any of the claims in question can be held to include Exhibit 4, unless I should treat them like the "nose of wax, which may be turned and twisted in any direction," and into which Mr. Justice Bradley says that courts must not permit claims to be transfigured. White v. Dunbar, 119 U. S. 47, 51, 7 Sup. Ct. 72, 30 L. Ed. 303. It is no hardship to O'Connor to be limited to the invention which he so specifically defined and which he obviously alone intended. The edge control, which he asserts to be in all cases unsatisfactory, and especially in the case of sheets which must be repeatedly used, may now prove to be of advantage: if so, he was wrong in thinking the contrary, and another man, adopting edge control, has made a new invention, even if he has adopted some of the elements of O'Connor's combination. To seize upon an idea which O'Connor rejected and to prove it fruitful and feasible is surely not to infringe his patent. Moreover, there is a strong presumption that there is patentable novelty between the two, one not being an improvement upon the other (Kokomo Co. v. Kitselman, 189 U. S. 8, 23, 23 Sup. Ct. 521, 47 L. Ed. 689), and this is especially the case when the earlier patent is repeatedly cited against the subsequent patent, as was the case (New Jersey Wire Co. v. Buffalo Metal Co., 135 Fed. 1021, 68 C. C. A. 672, and [C. C.] 131 Fed. 265, 268).

There remains only the question of Exhibit 3, which is a precise copy of O'Connor's patent and a clear infringement. Up to the date of the transfer of O'Connor to the plaintiff, no one claims that this structure was not licensed,

nor has the complainant shown any infringement by the use of Exhibit 3 after the expiration of the license so given. Of course, it was no infringement to manufacture O'Connor's patent while his license lasted, and, in order to bring the defendants into a court of equity, he must show either that after the expiration of the license the patent was infringed, or that the defendant thereafter threatened to infringe it. He has shown neither of these things, and his bill must therefore fail.

Let a decree pass dismissing the bill, with costs.

L. W. Southgate and W. K. Richardson, for appellant.
Philip C. Peck, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. Decree affirmed, with costs.

---

INTERURBAN RY. & TERMINAL CO. v. WESTINGHOUSE ELECTRIC & MFG. CO.

(Circuit Court of Appeals, Sixth Circuit. March 24, 1911.)

No. 2,080.

1. PATENTS (§ 107*)—ANTICIPATION—PRIOR ABANDONED APPLICATION.
    An abandoned application for a patent is not a bar to a patent to a later applicant, either as negativing novelty or as a printed publication.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 150; Dec. Dig. § 107.*]

2. PATENTS (§ 81*)—PRIOR PUBLIC USE—SUFFICIENCY OF EVIDENCE.
    In order to defeat a patent by evidence of prior public use more than two years before application for the patent was made by another, the proof must be very clear and definite, and as a general proposition mere oral testimony, depending on the memory of the witnesses, without the production of any visible sign or contemporary memoranda certainly fixing the character of the alleged anticipating structure, will not be regarded as sufficient, although such rule is not inflexible.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 104; Dec. Dig. § 81.*]

3. PATENTS (§ 324*)—SUITS FOR INFRINGEMENT—PRELIMINARY INJUNCTION— REVIEW OF ORDER.
    The general rule which should govern the appellate court in reviewing orders granting preliminary injunctions in patent cases is that the order will not be disturbed, unless it clearly appears that the court below has exercised its discretion upon a wholly wrong comprehension of the facts or law of the case.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 600–606; Dec. Dig. § 324.*]

4. PATENTS (§ 297*)—SUIT FOR INFRINGEMENT—PRELIMINARY INJUNCTION— EFFECT OF PRIOR DECISIONS.
    When there has been a prior adjudication sustaining a patent and the infringement thereof in the same or in another circuit, where its validity was contested on full proofs, a Circuit Court should, on motion for preliminary injunction, sustain the patent and leave the determination of its validity to the final hearing; and the rule is more emphatic when the former decision was by a court in the same circuit.
    [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 481–488; Dec. Dig. § 297.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes