## HARTFORD–EMPIRE CO. v. HAZEL ATLAS GLASS CO.

### No. 2162.

District Court, W. D. Pennsylvania.

Feb. 28, 1930.

Byrnes, Stebbins & Parmelee and Clarence P. Byrnes, all of Pittsburgh, Pa., W. J. Belknap, of Detroit, Mich., Vernon M. Dorsey, of Washington, D. C., and R. D. Brown, of Hartford, Conn., for plaintiff.

Green & McCallister and Edgar W. McCallister, all of Pittsburgh, Pa., Stephen H. Philbin, of New York City, Howard R. Eccleston, of Washington, D. C., and Fish, Richardson & Neave, of New York City, for defendant.

GIBSON, District Judge.

The plaintiff is a Delaware corporation, having its principal place of business at Hartford, Conn., and the defendant a West Virginia corporation, having a regular and established place of business at Washington, in the Western district of Pennsylvania. Plaintiff is the owner of patent No. 1,655,391, and in its bill of complaint alleges the infringement of that patent by defendant, and prays that defendant be enjoined from further infringement, and that an accounting of profits and damages be ordered. The defendant, in its answer, asserts that the patent is invalid, and denies infringement of

any of its claims if they be properly interpreted.

The patent in suit is for a method of and apparatus for feeding molten glass, and has for its object the production and preliminary shaping of successive mold charges of suitable form for advantageous use in glass blowing and pressing machines.

The first feeding of glass to molds was by hand. The operative thrust a hot metal rod, or pontil, into the furnace. Semiliquid hot glass attaches itself to hot metals, and by taking advantage of this fact the feeder was able to acquire a ball of hot glass upon the end of his pontil, which he retained by revolving the pontil until the mold was presented, when he ceased to revolve it and allowed a desired amount of glass to drop into the mold. This method, among other defects, was very slow, and the articles manufactured by it necessarily varied in weight and capacity. Hand feeding was succeeded by stream feeding, by which a stream of very hot, and consequently quite liquid, glass was allowed to flow from an orifice in the furnace into a mold, or into a combined husbanding and shearing device, and thence into a mold, the portion of glass in the husbanding device being followed by a stream flowing directly from the furnace to the mold. After the proper quantity had been deposited, the stream was cut and intercepted by the shear container and the operation repeated. This method is illustrated by Brooke patent, No. 723,983, issued in 1903. It had a number of defects. The hot liquid glass, when exposed to the air, formed a skin, or enamel, upon its surface, in consequence of which, when the coiling stream of glass fell into the husbanding device and the mold, there was an imperfect coalescence of the laps of the stream and occasionally air bubbles were infolded. The laminations and defects thus created in the mold were repeated in the finished article. The unsatisfactory results of stream feeding led to suspended charge or "gob" feeding, an advanced form of which is illustrated by the device disclosed by the drawings of plaintiff's patent. By this method separated charges were successively fed to a series of molds. The glass being more viscous than that of the flowing stream, and the charge being a single mass of proper size for the mold, the laps and coils of the flowing stream method were eliminated and thus imperfections greatly reduced.

The plaintiff's patent, No. 1,655,391, is one of many in the separate charge feeding field of the glass art. It presents sixty claims, sixteen of which (2, 3, 5, 6, 7, 24 to 31, inclusive, 51, 52, and 60) are not pressed in the instant suit. As fairly illustrating the claims upon which plaintiff relies, we quote Nos. 1, 9, and 18, method claims, and Nos. 8, 53, and 59, apparatus claims:

"1. In the manufacture of glassware, the method of delivering, to successively presented molds, continuous series of similar and compact charges of molten glass of shape and weight appropriate to the particular molds to be fed, which method comprises superimposing a sufficient head of molten glass, of proper viscosity for suspension in mold-charge masses, upon a delivery orifice of a proper contour and area to permit the feeding of charges appropriate to the molds to be fed, and, for each mold charge, discharging the glass through said orifice, reciprocating a discharge-controlling implement toward and from said orifice to determine selectively the shape of the discharged glass suspended beneath said orifice, and severing a mold charge from the discharged glass before the shape imparted to the discharged glass is lost and before the discharged glass receives any substantial undersupport."

"8. In apparatus for separating molten glass into mold charges, a container for the glass having a submerged outlet, shears adapted to open and close below the outlet to sever mold charges suspended therebeneath, a vertically movable rigid implement projecting downwardly into the glass in working alignment with the outlet, means for so moving the implement downwardly during the issue of each mold charge, and upwardly after the issue of said charge, that each charge will be produced and selectively shaped in suspension by the movement of the implement, means operating in timed relation to the motions of the implement for closing the shears to sever each suspended charge from the glass above the severing plane and a charge-receiver having its glass-supporting surface spaced below said severing plane at a distance greater than the length of the suspended mold charges when severed."

"9. The method of forming a mold charge of molten glass of desired shape, appropriate to the mold in which it is to be fabricated, which comprises discharging glass downwardly through an outlet and modifying the rate of the discharge by applying to the glass, above the outlet, a force which modifies gravity to produce a rate of discharge for any portion of glass being discharged, proportionate to the desired diameter of that portion and to the tendency of the weight of

the previously discharged portions to elongate that portion, maintaining the discharged glass in a suspended mass, and then severing a mold charge from the suspended mass." ·

"18. The method of feeding molten glass in a regular and uniform succession of suspended and freely dropped mold charges appropriate in size and shape to the molds in which they are to be fabricated, that comprises discharging the glass for each mold charge downwardly around an implement and through a restricted passage having a discharge outlet, moving the implement downwardly in the glass toward the outlet, during the discharge of each mold charge, so as to increase the resistance to the discharging movement of glass in said passage but at such speed as to accelerate the discharge of glass through said outlet notwithstanding such increased resistance, and shearing a mold charge from each discharged mass of glass."

"53. In apparatus for separating molten glass into mold charges and for receiving the charges, the combination, with a container for the glass having a discharge outlet submerged in the glass in said container of a movable implement projecting downwardly into the glass toward the outlet, but never touching the walls of the outlet, and adapted by its upward motion to retard the discharge of glass through the outlet, and by its downward motion to accelerate the discharge of glass from the outlet, means for reciprocating the implement periodically to produce successive masses of glass suspended beneath the outlet, shears out of contact with the glass during the downward motion of the implement and meeting beneath the outlet in timed relation to the reciprocations of the implement to sever a mold charge from each suspended mass, the upward movement of said implement being so timed as to raise the glass immediately above the plane of severance after each mold charge is severed, thereby preventing glass from piling upon the shears, and a charge-receiver having its glass-supporting surface spaced below the said plane of severance at a distance greater than the length of the suspended mold charge when severed."

"59. A glass feeder for delivering glass mold charges of a variety of controlled sizes and shapes, including an enclosure defining a channel for flowing the glass from a furnace and having a discharge outlet near its outer end, an impeller extending down into the glass and reciprocating in line with said outlet to control the discharge of glass from said outlet, shears periodically closing and opening below said outlet, and a system of controls, including means for adjusting the upper and lower limits of the movement of said impeller, means for adjusting the vertical position of said shears, means for adjusting the relative time of operation of the impeller movements and of the shear movements, and means for controlling the temperature of the glass delivered to said outlet, all of the said controls being selected in relation to one another for mutual cooperation and acting in combination, to produce compact mold charges of workable glass below said outlet, to impart to said charges the particular weight, length and cross-sectional dimensions best suited to the molds which receive said charges, to maintain constant and selected weight and dimensions of the charges, and to change the weight and dimensions of the charges to suit a variety of molds."

The drawings attached to the patent application disclose the embodiment of the patentee's claims. They show a glass furnace having a conduit, or forehearth, which at its outer end has a conical well. At the lower, and small, end of this well is a circular orifice, through which is conducted the viscous glass which is to be deposited in the mold. Over the well, in vertical alignment with the orifice, is a plunger, or needle, with conical point, slightly less in circumference than the orifice. Rather complicated mechanism, which will later be discussed more in detail, is shown for the movement of this plunger toward and from the orifice. Beneath the plane of the orifice are shown notched shear blades designed to cut the glass issuing from the well directly in the vertical line of the orifice. Mechanism is also provided for raising and lowering the operative plane of the shears, and for operating them in time relation to the movement of the plunger. Beneath the shear plane is shown an inclined chute which conveys the charge, after severance, to the mold. Not going into detail in respect to operative means, the vertical movement of the plunger reciprocating over the orifice may be varied and controlled in speed at different parts of its path of operation, and by virtue of this power, and the capacity of the shears for vertical change, plaintiff's machine is enabled to feed to the mold a charge which not only differs from the ordinary "tadpole" shape of a drop of viscous glass, but which may, within reasonable limits, be locally shaped as desired.

Defendant's machine has many features in common with that of the plaintiff. It has a plunger working in vertical alignment with an orifice at the bottom of a similarly shaped

well in the forehearth of a glass furnace, and also vertically adjustable shear blades of similar shape. The defendant's plunger, like that of plaintiff, is slightly less in diameter than the orifice of the well. In actual operation at the present time both plaintiff and defendant surround the plungers of their respective feeders with narrow sleeves which project into the glass in the well.

Defendant's feeder differs from that of plaintiff's patent in the means adopted for the reciprocation of the plunger and the operation of the shears. The plunger is operated by an air cylinder mounted above the plunger, to one side, on a reciprocating rod which has adjustable nuts for limiting both the upward and downward movements of the plunger. The shear blades, as is the plunger, are operated by a piston working in a cylinder. The shears may be raised or lowered. The operating means adopted by defendant allows the operating speed of the plunger and the shears to be increased or decreased, but does not allow any variance of the speed of either the upward or downward stroke of the plunger at any particular part of the stroke.

The plaintiff, to operate its plunger and shears, shows rather complicated means. The upward and downward paths of the plunger, and the movement of the shear blades, are ultimately determined by cams eccentric in form. The movements of the plunger and the shears are each determined by the full cycle of its respective cam. These cams are of differing shapes, and various lobes are shown for attachment to the cam for the purpose of varying the strokes at different parts of the path of the plunger. By means of these variations in cam shape the plaintiff's feeder, it is claimed, is able to put out charges of any desired shape.

No possible doubt can exist as to the infringement of plaintiff's patent by defendant's feeder if the patent claims are entitled to a broad construction. Plaintiff's counsel have forcefully insisted that the patent in suit is basic in the glass feeding art, and in their enthusiasm have displayed an inclination to attribute to their inventor a number of furnace features which are not even mentioned in the claims. Our study of the prior and cotemporary art, as reflected by the testimony, has caused us to lag far behind counsel, who have claimed for Peiler the discovery of the advantages of the well in the forehearth, the nonseating needle plunger, the lateral and vertical adjustment of the shears, severing in suspension and separate charge

(or "gob") feeding, as well as all shaping of the charge. Brookfield, No. 883,779, filed December 28, 1903, Steimer, No. 1,663,925, filed February 12, 1910, Ferngren, No. 1,-374,739, filed January 24, 1914, Wilzin, British patent No. 7,183, filed March 23, 1912, and a number of other patents prior to the patent in suit, disclose a well with a plunger working therein. The claim of discovery of the "needle" plunger and its benefits by Peiler is just as baseless as the claim in respect to the well. Brookfield, No. 883,779, filed December 28, 1903, shows a reciprocating plunger over an orifice. The plunger was designed to contact with the orifice wall. Morrison, No. 810,167, filed February 16, 1904, shows a reciprocating plunger, operated by air somewhat as defendant's feeder. This patent does not disclose severing in suspension. Bowman, No. 1,166,576, filed August 1, 1914, also shows a slender reciprocating plunger, as do four Ferngren patents, Nos. 1,196,848, 1,362,785, 1,374,739, and 1,-415,824. The first of these patents was granted more than two years before Peiler's filing date. A number of other patents, antedating Peiler in the Patent Office, disclose a reciprocating plunger. In this connection it is to be noted that reports and drawings, offered by plaintiff to establish a date of invention prior to the filing date, show November 28, 1917, as the first date on which Mr. Peiler experimented with a slender plunger. Up to that time his drawings show a large, or "elephant's foot" plunger. It may also be remarked that in the report of this experiment the impelling implement is first termed a "needle." As the Ferngren patent application was the property of plaintiff, the change in the form of the plunger seems to fix the time when one essential feature of the patent in suit was first evolved.

Plaintiff has stressed the shear feature of the patent, and the effects to be obtained in shaping the mold charge by means of vertical adjustment. Plaintiff's shears perform the same functions described in Harding, No. 1,150,030, filed December 1, 1913, and issued August 17, 1915. This patent also discloses severing in suspension. No claim in the patent sets out any form of shears.

Plaintiff strenuously contends that to Peiler is due the credit of introducing severance of the mold charge while in suspension, and that therefore the patent in suit is entitled to such construction as will give the plaintiff the benefit of that discovery. Again the prior art seems to stand firmly in opposition to this claim. We have already mentioned Harding, No. 1,150,030. In discuss-

ing his device (page 1, line 79) Harding says: "My invention still further consists in the arrangement of a pair of automatically cooled vertically adjustable shears between the discharge opening and the mold, the arrangement being such as to govern the shape of the glass delivered to the mold."

On page 3, he speaks of obtaining different shapes by vertical arrangement of the shears, and specifically mentions the ability to obtain a ball-shaped charge "dropping into the mold," also, by dropping the shears, the production of a long charge suitable for a narrow-necked mold. Earlier still than Harding is Hitchcock, No. 805,068, granted· November 21, 1905, for a method of feeding glass in "gobs," and reissue patent No. 13,-929, dated June 5, 1915, for apparatus contemplated by the method patent. Some dispute is possible in respect to the Hitchcock patents as to whether or not they disclose plus pressure of air for the extrusion of the charge and cutting in suspension.· In Hartford-Fairmont Co. v. United States Glass Co. (D. C.) 2 F.(2d) 109, 111, Buffington, C. J., and Schoonmaker, D. J., sitting, the opinion seems to attribute severance in suspension as an idea of the patent—and correctly, as we think. During the trial of this case defendant operated a machine purporting to have been constructed according to the teaching of Hitchcock, which satisfactorily manufactured glass, and shaped the "gobs." Greater than atmospheric pressure was used in the extrusion of the charge, which was cut in suspension. In Hartford-Fairmont Co. v. United States Glass Co., supra, Judge Schoonmaker discussed Brookfield, No. 883,-779, saying, among other things: "The use of the plunger to regulate the flow of glass through a discharge orifice was disclosed to the glass art by the Brookfield patent, filed November 15, 1901, and prior to the. date of filing of the plaintiff's Hitchcock patent. To our mind, the Brookfield patents disclose all the elements necessary for feeding separate 'gob' or measured charges of glass to molds, and also disclose that the 'gobs' are depending below the discharge orifice at the time of severance from the stream of flowing glass."

A Brookfield feeder was also operated at Washington during the trial. The cam which actuated the valve was differently shaped than that shown by the patent drawings. This was made necessary because the molds were operated more speedily at the time of operation than was the case at the date of the patent application. The shape of the°edge of the shearing device was also slightly more acute than the angle shown by the drawings, but the change was merely mechanical, and was such a change as would naturally occur in practice.

Howard, No. 1,315,668, filed July 22, 1916, disclosed automatic means for reciprocating a hollow cylinder over an orifice in a well. Through this cylinder vacuum was to be applied to withdraw the part of the glass from which the charge had been severed, and pressure to extrude the charge and fatten the upper part of it. The drawing shows a cylindrical charge, with the neck attenuated for cutting. It is interesting to note that in his application, filed on July 22, 1916, Howard, in describing his invention, said: "Various methods have been proposed and some embodied this principle of intermittent flow caused by variation of pressure in the glass within the supply reservoir. In one of these old methods, there is a plunger within the body of the glass in the supply reservoir just above the orifice. By moving the plunger down, flow of glass through the orifice is accelerated and tends to fill up the central portion of the globule and prevent contraction or attenuation of the stream from the globule. When in using this method, it is desired to contract the globule near the orifice in order to cut it off through its narrowest portion, this plunger is raised or retracted from the orifice thus decreasing the pressure of the glass at the orifice and checking the flow."

Mr. Howard, now in the employ of plaintiff, when on the stand, stated that this language resulted from a mistaken conception of what he saw in a glass plant some time prior to his patent application.

Mr. Howard, by his air column acting in a tube, manufactured glassware two years in advance of the Peiler application in suit, and his feeder went into a limited commercial use. While it differs in many details and in efficiency from plaintiff's feeder, as now used, it discloses suspended feeding and an ability to change the ordinary "tadpole" shape of a charge of glass.

Wilzin, British patent No. 7,183, filed March 23, 1912, shows a thin, reciprocating plunger over a well. The plunger contacts with the well, and the operation was slow, owing to the mold presentation scheme, but the feeder undoubtedly had the power to swell the last part of the charge to a limited degree, as do all reciprocating plunger feeders.

Bridges, No. 1,590,924, was filed November 25, 1918, and issued June 29, 1926. Prior to this application Bridges had filed

another on February 24, 1917, which was rejected by the Patent Office. Its only material difference from the granted patent was that in it the plunger was seated, and not of less circumference than the well orifice, as was the case in the patent. The patent shows a plunger and shear feeder, the operative means being very similar to that of defendant's feeder.

Tucker and Reeves, British patent No. 131,586, has a United States Convention date of August 12, 1918. It discloses a reciprocating plunger and shear feeder, which severed in suspension and controlled the weight and shape of the mold charges. It will be noted, however, that Peiler had operated his paddle needle feeder, which disclosed almost all the essential features of the patent in suit, at the plant of the Monongah Glass Company, prior to the filing date of Tucker and Reeves.

Other patents and uses might be cited to sustain our conclusion that the Peiler patent claims are not entitled to broad construction.

The plaintiff, however, has undertaken to prove that Peiler conceived the basic ideas of his patent prior to the dates of all those patents not issued more than two years prior to his application. Plaintiff has also undertaken to establish Mr. Peiler's conception as of as early a date as January 1, 1913. In making such a claim Mr. Peiler is doubtless sincere. One who has solved a problem is very apt to think that the solution was within his grasp long before it actually was in hand. Our analysis of the evidence, with the light thrown upon it by unquestioned facts, has convinced us that his conception of the paddle needle does not antedate January 1, 1918. In the first place, Peiler did not come into the glass art until 1911, at which time was assigned to him the duty of improving plaintiff's glass feeding machinery. He filed applications for a number of patents, prior to the instant application, none of which disclosed anything of great value, or incorporated the basic ideas of the patent in suit. An examination of his reports and drawings, which have been offered in evidence to show the progress of his work which culminated in the instant patent, will show that between 1911 and 1918 he followed too many will-o'-the-wisps to have been in the possession of the true light. Photographs and reports show him experimenting in 1913 with a plunger, it is true, but with a large, clumsy implement operated by hand or crude mechanical means in a pot which had none of the characteristics of the well of his patent. As the reports and drawings progress in

point of time, it will be noted that he was experimenting with various forms of proposed feeders. At one time he is apparently seeking to improve upon the ideas of Cleveland, whose patent, No. 901,881, had come into the possession of plaintiff. See Plaintiff's Exhibit 107-a, a drawing showing a large seating plunger over a tubular orifice. This drawing of a feeder, with a description of its operation, was received by the patent attorney on February 24, 1917. As we think, it proves conclusively that Mr. Peiler, at that time, had no grasp upon the method of operation shown in the patent in suit. At another time, experimentation is in connection with the Hitchcock feeder. As late as September 29, 1917, the main hope seemed to be in this form. On that date he reported: "As a general conclusion I should say that this type of feeder looks very promising indeed. * * * I should, therefore, certainly advise proceeding with further experiments on this feeder." On November 28, 1917, as appears by report of November 30, 1917, he conducted an experiment with a slender, or needle, plunger. As this is the first time that a slender plunger appears in his experiments, and in view of the fact that shortly theretofore he had come in contact with the Steimer and Ferngren ideas and was using the term "needle" adopted by Ferngren, we may well assume that Mr. Peiler at the time was engaged in trying out the ideas of Ferngren and Steimer, both of whom showed a slender needle. Even at this late date the favored form was the Hitchcock type, for in the report Mr. Peiler says of the needle feeder: "The operation of the feeder looked so good that I think it is worth while going further with it, as it might take the place of the Pulsator Feeder."

From 1913 to early in 1917, no trials of any form of reciprocating plunger feeders had been made. During that period Mr. Peiler had filed a number of patent applications, and the plaintiff had put into commercial use what is termed a "paddle feeder." In that feeder a paddle moving in the main body of glass in the furnace impelled a measured charge of glass over the lip of a dam from which it flowed into the mold. By this feeder it was possible to regulate the weight of the mold charge with reasonable accuracy, but shaping it or cutting in suspension was out of the question. An application for a patent on the "paddle" feeder was filed August 13, 1914. A circular bowl was later added to this feeder. This bowl had a circular orifice, through which the glass flowed to the shears.

No satisfactory explanation has been offered to make plain why Peiler, if he had formed in 1913 any true conception of his patent in suit, wasted so much time upon feeding devices which were, at best, ineffective. In 1918 some progress is made. In March of that year a trial feeder was installed wherein a reciprocating needle plunger was operated over the orifice in the paddle bowl feeder. The feeder, thus equipped, worked fairly well, and the plaintiff company manufactured and sold a considerable number of paddle needle feeders during the next four or five years; but just how they functioned, and whether they locally shaped the mold charge, is not told by any contemporary report. On May 5, 1919, applications for patents were filed upon the paddle needle feeder and the single needle feeder, as the patented device in suit was called. Plaintiff put out its first feeder based upon the patent in suit in 1922, since which time the single needle feeder has practically replaced the paddle needle form. The commercial feeder, however, is an improvement of the patent feeder in several respects.

The Patent Office history of the patent in suit throws light upon the place in the art which plaintiff's device may claim, and conclusively establishes, we think, that plaintiff is not entitled to protection, under the patent in suit, against all possible reciprocating plunger feeders which sever in suspension, and can properly claim, at most, priority upon its special apparatus and method of selective local shaping of the charge. That history is one of continuous conflict from May 5, 1909, the date of the application, almost to January 3, 1928, when the patent issued. The application of the patent in suit was, at various times, in interferences with applications filed by Bridges, Ferngren, Howard, Lott, Miller, Steimer, and Tucker and Reeves, all of whom had filed applications prior to that of Peiler. While enlightening, space does not allow any extended review of these proceedings in the Patent Office. The most important of these interferences were brought to an end by the order of the Commissioner after plaintiff had acquired or had control of the contending applications, one after another. Prior to the withdrawal of the interferences by counsel the Patent Office had steadfastly rejected all claims having approximately the same subject-matter of those in suit. After the interferences had all been ended, the claims in the patent in suit were all withdrawn. After rewriting, one hundred and four new claims (many of them rewording of original claims) were presented, and after a considerable time and much controversy the patent was allowed. Before allowance, however, the Primary Examiner had rejected all claims, and his action had been supported by the Examiners in Chief. A rehearing was granted, and Pelier, after canceling a number of claims, filed affidavits to show that he had completed his invention prior to November 14, 1917. That the Patent Office intended to grant any such broad monopoly as is claimed by plaintiff's counsel in this suit is incredible, if any evidentiary weight is to be attributed to various disclaimers filed by Mr. Peiler with the approval of the plaintiff, or filed directly by plaintiff.

On May 4, 1920, interference No. 44,608 (No. 44,610 later consolidated with it) was declared between Peiler, S. No. 294,792, filed May 5, 1919, Bridges, S. No. 264,015, filed November 25, 1918, and Carnahan, who later defaulted. The Bridges and Peiler applications were both owned by the plaintiff on May 17, 1921, when plaintiff filed the following concessions of priority:

"1. As owner of the Peiler application it concedes priority to Bridges of the subject matter of counts 1, 5 and 6."

"2. As owner of the Bridges application it conceded priority of invention to Peiler of the subject matter of counts 2, 3, 4 and 7."

The counts conceded to Bridges were as follows:

"1. The method of serving predetermined quotas of glass from a mass of molten glass, which consists in permitting a body of glass to flow by gravity from said mass, in inserting a punty into said flowing body from above in such manner that said body is transferred to said punty, in supporting said body from said punty until a top contracted neck is formed thereto and then in severing said neck and permitting the body to drop by gravity."

"5. The method of serving predetermined quotas of glass from a mass of molten glass, which consists in permitting a body of glass to flow from said mass, in retarding said flow by the downward movement of a punty into said flowing body, in attaching said body at its upper end to said punty and supporting it thereon, in interrupting the flow from the mass of molten glass by the upward movement of said punty and then in severing said body and permitting it to drop by gravity."

"6. The method of serving predetermined quotas of glass from a mass of molten glass contained in a receptacle having a bottom flow orifice, which consists in permitting a

body of glass to flow by gravity through said orifice, in moving a punty through said orifice and into said flowing body whereby the flow thereof is retarded and the support of said body transferred to said punty, in supporting said body from said punty until it stretches and forms a top contracted neck, in raising said punty within said orifice and then while moving, in severing said neck and permitting the body to drop by gravity."

In interference No. 48,414, declared between Peiler, in instant application, Howard reissue application, S. No. 384,158, original filed July 22, 1916 (patent No. 1,315,668), and Bridges, S. No. 264,015, filed November 25, 1918, Peiler, on November 11, 1925, formally abandoned the claims in issue, which were as follows:

"1. The method of delivering molten glass from the orifice of a receptacle containing the same, that comprises establishing a gravity flow of glass through said orifice and controlling the movement of the glass through said orifice by applying an accelerating force thereto, said accelerating force acting through a substantial distance, thereby shaping the glass into an elongated mass of controllable cross-sectional area."

"2. The method of forming masses of molten glass that comprises causing the glass to flow through an opening, severing successive masses of the said glass while hanging freely below the said opening, and while leaving a substantial portion of glass protruding from the said opening, and drawing the said protruding portion of glass back into the said opening for incorporation with the next succeeding mass."

The plaintiff concurred in the abandonment. It was the owner of the three applications when the interference was declared. Priority was awarded to Howard.

On April 29, 1924, interference No. 50,893 was declared. The interference was not upon the Peiler application in suit, but upon an application for another patent filed December 4, 1916. The other parties were Miller, filed September 23, 1919, Howard, filed February 27, 1919, and Ferngren, filed February 10, 1919, renewal of application filed September 29, 1913. The claim was as follows: "The combination with a container for molten glass having a discharge outlet below the surface of the glass, of means for forming and separating molten glass into molded charges, including shears adapted to close beneath the outlet to sever the glass, and rigid reciprocating means in adhesive contact with the glass but out of contact with

the outlet adapted to retard the discharge of glass therefrom, and support the severed stub while the shears are closed."

On February 25, 1925, Peiler, Ferngren, and Howard filed a joint paper wherein they stated: "On considering the issue of the interference, we believe that, in several respects, it is not in proper form to bring out the points of common invention, over the well-known Steimer application, which are present in the several applications involved in this interference."

The paper filed seems to be an admission of the force of Steimer's application, hereinbefore mentioned.

From a review of the testimony we find, first, that the patentee is not entitled to a date of invention earlier than that of his application, May 5, 1919; and that on that date he had been anticipated by several patents upon reciprocating plunger and shear feeders, and was not entitled to priority of invention upon mere feeding of mold charges by means of a reciprocating plunger or upon severing such charges in suspension. This finding necessarily carries with it the further finding that plaintiff, by its patent, is not entitled to a monopoly upon all shaping of mold charges by a plunger and shear feeders, because such machines have the inherent function of fattening the charge to some extent upon the down stroke of the plunger and attenuating the upper part of it when the plunger is raised just before or at the time of severance. The plaintiff cannot deprive a prior inventor of the function of his machine, even though that function were not mentioned in his claim. Nor does the mere raising or lowering of the shear plane, to modify the shape created by the plunger, constitute invention. To any one of greater than simian intellect such a device would be suggested by his knowledge that a drop of viscous glass naturally attenuates as it hangs upon the orifice. In any event, such use was not new with Peiler. Harding patent, No. 1,150,030, filed December 1, 1913, shows vertically adjustable shears beneath an orifice of a glass furnace (not of plunger feeder type).

Accepting the propositions of the immediately preceding paragraph as a basis, we are called upon to determine what, if any, is the essential patentable idea of the patent in suit. It is stated in a multitude of ways, but in claim 1 it is set forth as: " * * * Reciprocating a discharge-controlling implement toward and from said orifice to determine selectively the shape of the discharged glass

suspended beneath said orifice. * * *." All plunger feeders reciprocate a discharge controlling implement toward and from the orifice of the well and sever at selected times. Therefore, unless we infer that plaintiff is seeking control of that which does not belong to it, i. e., all plunger and shear feeders, we must find its true claim in the words, "to determine selectively the shape of the discharged glass." Even so, at first thought it would appear that plaintiff is attempting to arrogate to itself something which in greater or less degree is the function of all plunger feeders. In each operation of any such feeder the orifice most suitable to the mold must first be chosen; and then the weight of the charge must be determined. The weight which must be in the charge produced, the orifice being known, is determined by the length or force of the plunger stroke upon the depth of glass in the well. And if the operator desires that weight in the shape of a long slender charge, or in the shape of a short thick one, we are unable to see any encroachment upon the field of invention if he regulates his plunger to give a longer and less forceful stroke, and thereby produce the slender charge, or to give a shorter and more forceful stroke to produce the thick charge. In other words, if an operator has the legal right to use a machine, he has a right to all its natural functions which have become known to him through observation and ordinary mechanical means. But it possibly may well be claimed on behalf of the defendant that it has given to the world a function which was not known to the ordinary operators of plunger feeders, and which was not inherent in any form of such feeders. It is claimed for the embodiment of the patentee's ideas that, while others might have crudely shaped mold charges in the manner just indicated, he taught the world how to obtain any desired shape of charge. We quote the patentee (page 1, 72–80): "The present invention accomplishes this preliminary shaping of mold charges with greater ease and exactness than heretofore by the adjustable operation of suitable impelling means coacting with an orifice below which the mold charges are accumulated and suspended, and it employs the elongation of the suspended charges in controlling their shape."

The patent drawings disclose an ordinary slender plunger over an orifice, with notched shears beneath the orifice. By means of a very clever combination of well-known mechanical elements, such as worms, levers, cams, etc., provision is made for the control of the chosen speed of the plunger at any stage of its cycle. This control, adapted to the known action of viscous glass in connection with an impelling or intrusive plunger, enables the operator, it is claimed, to produce a mold charge having any local shaping desired. Provision is made for changing the height or depth of the plunger stroke and the height of the shears without shutting down the furnace.

It cannot be conceded that the patentee who has devised means to control the speed of a plunger at any part of its stroke, is entitled to prevent others from controlling the speed of their plungers by all means whatsoever, and to confine them to one speed throughout the cycle of the plunger. It may be agreed, at least for the purposes of this case, that one who has discovered means for so regulating a plunger's speed and force is entitled to patent protection upon the particular mechanism by which he has accomplished the result.

Limiting the plaintiff's patent as we think it must be limited, the defendant's feeder does not infringe it. The length of the upward or downward stroke of the plunger is limited by reels, or stop nuts. This feature appears in the Steimer patent. The plunger is reciprocated by means of a compressed air cylinder, not by the complex mechanical means adopted by the plaintiff. The shears are also operated by air lines and a cylinder. Even were the result the same as that accomplished by plaintiff's cam-operated plunger, the means adopted are quite different. The defendant's plunger stroke, however, beyond matters of length and force, is not under any control by which the local shaping of the charge contemplated by the patent may be accomplished. Each of the air lines to the top and bottom of the plunger cylinder has a valve thereon, which plaintiff contends may be used for throttling, and thus regulate the speeds of motion of the plunger. As actually used, the valves cushion the stroke of the piston, and aid in the regulation of the air supply. They might be used, perhaps, to vary the speed of the up and down strokes of the piston, but the possible shaping effects would be very narrow. Defendant's air-operated plunger is not new in the glass art. Bridges patent, No. 1,121,608, shows a plunger operated by a cylinder, with valves. In this patent the plunger is not working over an orifice, but in his patent No. 1,590,924, filed November 25, 1918, Bridges shows a plunger over the orifice, and refers to the original patent for means of operation. Patent, page 2, 74–80.

We find that plaintiff's patent No. 1,655,-391 has not been infringed by the defendant, and shall therefore dismiss the plaintiff's bill of complaint.

Let a decree be presented.