## HARTFORD–EMPIRE CO. v. HAZEL–ATLAS GLASS CO.

### No. 4414.

Circuit Court of Appeals, Third Circuit.

May 5, 1932.

WOOLLEY, Circuit Judge, dissenting.

Byrnes, Stebbins & Parmelee, of Pittsburgh, Pa. (C. P. Byrnes, of Pittsburgh, Pa., Thomas G. Haight, of Jersey City, N. J., V. M. Dorsey, of Washington, D. C., W. J. Belknap, of Detroit, Mich., and H. K. Smith and R. D. Brown, both of Hartford, Conn., of counsel), for appellant.

Charles Neave and Stephen H. Philbin, both of New York City, and Howard R. Eggleston, of Washington, D. C., for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge.

Of all the major industrial arts, glass blowing has been the slowest to change from hand to machine methods. In the three hundred years following the bringing of the glass-blowing industry to the United States by the Jamestown colonists and their building of two factories to make beads for sale to the Indians, there has been little, if any, change in the blowing of glass containers of any kind. This is due to several causes. The high skill and delicate handling of molten glass requisite for a glass blower made his art one where human skill seemed indispensable and the possibility of reproducing this human skill by a machine seemed impossible. Second, molten glass, owing to its intense heat, its rapid change from fluidity to viscosity, made the art one where observation of the characteristics of glass in these rapid changes was very difficult. And, lastly, the skill of the glass blower and the strangle hold of the glass blowers' unions made organized labor an adamant wall to be overcome by experimenters in their efforts to construct machines. Whatever were the causes, the art for three hundred years showed no advance. An appreciation of these facts and others that might be suggested must now be had by this court to enable it to give due regard and due reward to those who have brought about a rapid and well-nigh miraculous change in the glass-blowing art.

The situation in this present case is in many particulars not unlike that of another glass-blowing case reported in Consolidated Window Glass Co. v. Window Glass Mach. Co. (C. C. A.) 261 F. 362, 368, 369. It involved the kindred step of changing from the lung blowing to the machine blowing of window glass. There, as here, the experiments extended over several years. They were carried on in barricaded buildings owing to the hostility of the labor unions. In that case the trial judge (see page 366 of 261 F.) detailed at length some of the difficult problems encountered in changing from lung blowing to machine blowing of window glass, and many such like problems here arose in changing from lung-blown to machine-blown bottles. He there said: "It is, perhaps, true that few, if any, of the arts presented so many perplexing problems as the drawing of glass cylinders * * * from a molten bath. These problems appeared at the very beginning of the operation, and rose up persistently all along the way. The inventor had to deal with elemental actions, forces, and properties of matter * * * heat applied to the glass, and cold applied to the molten liquid; the properties and physical constitution of the glass as it passed from the solid to the liquid condition, through the plastic condition up to the solid state again. * * * These problems were not only numerous and complex, but many of the difficulties were latent and were only located after repeated experiments and failures. When the difficulty had been definitely determined and located, the remedy had to be found."

The recited problems and many others existed in the present attempt to change from lung blowing to the machine blowing of bottles in the present case. It follows, therefore, a realization of the practical difficulties confronting an inventor in the present case, as we have said, is necessary to a just decision of the case and is in line with what this court pointed out in the foregoing case, when we said that it "points out the proper attitude of a court toward the patents which have bridged the great chasm between the hand-blown and machine-drawn window glass"; and here between lung blowing and machine blowing of narrow necked bottles.

In that case millions of dollars were sunk in experiments covering several years, and as there stated: "The plants were closed and the operations carried on in the most carefully guarded way."

Taking up the ancient lung-blown method: Its usual course was for a workman to insert a "pontil" or steel rod into the opening or "glory hole" of a glass tank or furnace. Rapidly revolving this pontil, he gathered a mass of molten glass on its end, withdrew it from the furnace, and, while blowing, worked it over a mold by turning while it was in a viscous, nonfluid condition. By skillfully blowing and turning, he was able to allow a desired quantity of viscous glass, or "gob," to hang in suspension from the mass on the pontil. Contact of the air with this suspended mass made the glass still more viscous and caused a skum or skin over its outer surface. This "gob" or mass, influenced by the gravity of its own weight, or if left without turning of the pontil rod, descended with increasing velocity, leaving a "gob" tail which gradually grew thinner and more attenuated until the whole structure assumed what was called a "tadpole" shape. If such a tadpole shape was allowed by the blower to enter the mold, the tail would follow the main mass and fall in layers upon the gob, which latter, when blown into the form of the mold, would, for various reasons, be unequally distributed and thus make the article thicker at one side than elsewhere, and would also show objectionable waves in the blown article. To avoid these defects, which indeed could not always be overcome by even the most skillful blower, another skilled workman stood by with shears, and as soon as the pontil operater had depending or in suspension a gob of sufficient quantity and of a size approximately like the walls of the mold, the other workman sheared the mass loose *while in suspension* and it was dropped into the mold and was blown to final form. The "tadpole," with its attenuated tail, the lapping of that tail over the gob, and a gob of a size sheared in suspension and of a shape to confrom to the sides of the mold, are well known to those familiar with the practices of the lung-blown art.

But, of course, the work of the glass blower was limited in product and, owing to lack of skill, inattention, or other causes affecting different blowers, bottles and other containers were oftentimes wavy in appearance and the glass on the walls of the containers was of unequal thickness, which was, of course, highly objectionable. But

so the lung-blowing art continued. Meanwhile there had come into it, first, the placing of molds on a revolving frame or table, and, second, the use of air in blowing, steps which are described in reported cases involving those features. But the most radical step in bottle blowing occurred about 1904, when the Owens-process was invented and came into rapid use. Without entering into details, it suffices to say that in the Owens invention molten glass, *at a very high temperature and of great fluidity,* was drawn up *by suction* to Owens molds and there mechanically blown. It will be observed that in the hand method the gob dropped into the mold was of desired quantity and desired artificial shape. It will also be noted that in the old blowing process there was no continuity and no regularity of gob-forming, but each gob was formed individually as the individual blower blew and shaped it. But in the Owens device there was constant feeding of the highly heated fluid glass, there was a continuous, even, and uniform suction pull, a constant stream was fed to the molds, with the resultant stream of gobs, identical in all ways. When the machine was properly timed and adjusted, there was secured a product uniform in character and of a quantity limited only by the number of machines used. Owens' device was a great step. The basis of its success was a constant stream of glass so high in temperature as to maintain fluidity, as contrasted with that viscosity and lower temperature used in lung blowing. In his process fluidity was essential and viscosity was fatal.

As we have indicated, the labor organizations were vitally interested in the supplanting of hand blowing by mechanical blowers, and we naturally look to the proceedings of their several organizations to find what machine blowers were of practical working capacity and ones which they regarded as supplanting lung blowing. We can therefore, and do, rely on their opinion in that regard, for successful machine blowers largely spelled ending of the supremacy of lung blowing. In an article prepared by the president of one of these unions, he said: "Up to about 1892 practically all of the bottles manufactured in the United States were made by hand blowers and the introduction of machinery had not received serious consideration from the association. During the period extending from about 1892 until perhaps 1904, several bottle-making machines were tried, some of which were put into successful operation, supplanting a certain number of hand workmen. *All of these ma-*

chines, however, required the service of one or more skilled glass workers. They all required a gatherer to feed the glass to the machine and some of the machines were operated entirely by hand. Some required a transfer boy and take-out boy. Some of these machines were not automatic at all, in the present meaning of the word. The 'Johnny Bull,' for example, was a highly successful machine, and it displaced a certain number of workers, but the only automatic feature of the machine was that compressed air was used instead of lung power. All these mechanical operations were manually actuated."

It is thus clear that during that time no mechanical blower of any importance was invented, but about 1905 a startling machine appeared, which is thus described by the official referred to:

"In 1905 the bottle blowers were suddenly confronted with a new bottle-making machine, which had every appearance of supplanting substantially all of the then existing semi-automatic bottle machines and putting the Bottle Blowers Association almost out of existence. Notwithstanding the increased use of 'semi-automatic' machines, by far the greater part of all bottles made at this time were made entirely by hand. This machine was the Owens bottle machine, which drew the molten glass for the mould charge, *from the tank directly into the blank mould*, thereby doing away with hand gathering. The bottle was delivered from the machine completely finished and it was of a quality closely approaching, if not fully equaling, that produced by the hand blower. The introduction of this machine was rapid. In 1905 there was but one in operation, and in 1917 there were about 200 of these machines engaged in commercial production. It was apparent that if these machines continued to be adopted at that rate it would be a comparatively short time when they would be capable of turning out practically all the common bottles used in the country, and the practical elimination of skilled workmen. The production of these machines, even at an early date, was such as to cause serious alarm among the bottle blowers. * * *

"The more general use of Owens machines was prevented by their high investment cost and by the fact that licenses for their use were confined to a comparatively few concerns, but we find the bottle blowers in 1911 still facing what appeared to be a most critical situation, with respect to the Owens machine, and, strange as it may seem,

they were looking to improved machines of types other than Owens, that is the Johnny Bull and O'Neill machines, for instance, to provide work for those who might be thrown out of employment by the Owens machine."

Owing to its extremely high cost—one of these Owens machines cost $80,000—it was quite apparent that in the mass production which they effected and the inability of smaller factories to equip themselves with such expensive machinery, two things would follow: First, the Owens machines would monopolize the bottle industry; and, second, the small factories would be driven out of existence because they could neither install Owens machines, due to cost and refusal to license, nor compete with Owens in the cost of production. In that respect the address of the official whom we have already quoted further said: "The more general use of Owens machines was prevented by their high investment cost and by the fact that licenses for their use were confined to a comparatively few concerns, but we find the bottle blowers in 1911 still facing what appeared to be a most critical situation, with respect to the Owens machine."

The testimony of Cunningham, who was an experienced officer in a glass company, but not interested in this suit, was that: "The so-called independent manufacturers of bottles were suffering great privations due to the competition with the automatic Owens machine. The independents were struggling for an existence, and using semi-automatic processes, which put them in an unfavorable competitive position as to prices."

While the Owens machine thus confronted the labor organizations, a new danger arose which threatened to eliminate the glass blower even from small factories. This situation is thus described by the official quoted:

"While they were still in a position of great uncertainty and suspense in regard to the Owens machine they were confronted with another improvement in glass-working machinery, which seemed, at first, to carry a threat equally as dangerous as the Owens machine. The first record which we find of this is in 1911, when their attention was directed to what was called a 'pouring or flowing device', of which there were five then in use in the Pittsburgh district. The first commercial use of this device was about 1908. This flow device, however, was used in making pressed, and pressed and blown ware only and it could not compete with the Owens machine in making narrow neck bottles.

"It may be assumed that the general con-

struction of these devices is shown in United States Patent to Homer Brooke, No. 723983, dated March 31, 1903. The general principle was to cause *a stream* of molten glass to *flow* from the tank into the mold until a sufficient quantity had accumulated, at which time the stream of glass was severed and temporarily supported while another mold was being brought into position. The glass accumulated in the mold in exactly the same way that molasses might be poured from a pitcher into a tumbler.

"This pouring device appeared to the bottle blowers to be an iron man which could be put to work delivering glass automatically to the semi-automatic machines then in use, to the elimination of all hand gatherers, but this proved to be a false alarm."

It is interesting to note that in that connection the trade, these labor organizations of practical workmen, recognized the fact that both the Owens and the Brooke devices were of the same character in that the molds were *fed by a constant stream* of glass flowing (and therefore of high heat and fluidity) and not fed by selected pre-formed quantities of glass of low heat and consequent viscosity. In that respect the article already quoted, while recognizing the individual ways in which Owens' and Brooke's mechanical blowers worked, made it clear that both worked on the same general principle of feeding from a tank by a continuous stream of glass which was fluid and therefore of high temperature. In that regard it is said: "The basic distinction between these two classes was that the Owens machine sucked its mold charge directly into the blank mold, whereas the Brooke flowing device poured a stream of glass into the mold, and this mold might be one of the semi-automatic machines formerly in use."

From the evidence of the witness Cunningham it appears that during 1916, 1917, and 1918 the present defendants, for the manufacture of tumblers, "were using a flowing method known as the Brooke *flowing feed,* which was a continuous stream of glass flowing into the mold interrupted at intervals as the mold was charged." He also states that the stream flowed into the mold folding in laminations, formed blisters, and was not attractive. And such, as we note later, was the finding of the court below, namely, that Brooke's was a failure.

From the above it is clear that up to this time, while the Owens device threatened to monopolize the art by driving the small factories out of existence and as a result deprive of work the glass blowers, who still continued to work in such small factories, yet no step had been taken to supplant the glass blowers, who still worked in such small surviving factories, by installing therein a mechanical device which would mechanically imitate and be an accurate mechanical substitute for the blowing operation of a glass workman—blower or gatherer—namely, form a gob of glass which was *suspended* from a pontil while being conformed by lung blowing to a desired shape mold and also supplant his skilled fellow worker whose duty it was to timely shear such conformed gob, while held in suspension by the pontil. Or, to state the same thing in another way, no machine had been produced which mechanically did the individual work of the skillful glass gatherer and the equally skilled shearer in the same way, in the same sequence, at the same times, and mechanically reproduced the same functional operations theretofore manually done by the blower by simultaneously turning and blowing and of the shearer by severing the gob at the exact instant that the blower got it to shape.

Now an analysis of the work of a blower with a pontil and the shearing rod is this: As a mass of glass descended from the pontil rod, the manipulation of the rod was such that the mass or gob, instead of being allowed to descend with increased speed, was, by the skill of the blower, held in *suspension* while fluid glass was lung-fed or stuffed into it and the skin of the gob was thereby distended uniformly until the artificial gob thus produced approximated the desired mold shape, at which instant the flowing stream from the pontil was severed by the shearer, and the gob in its artificial form passed into the mold.

We pause for a moment to say that the skill of a glass blower, dealing as it did with instant dispatch, in simultaneously turning the gob and at the same time using just sufficient volume of lung power to blow the forming and suspended gob to desired shape, with equal and distributed skin thickness, and the co-operation of the shearer who sheared the suspended gob at that exact instant which made the gob a successful one, all these human, variable steps, coupled with the rapid changes of molten glass as affected by air, metal, and internal and external heat, united to stamp the glass blower as an artisan of the highest skill, the supplanting of whose skill by an insensate machine of constant uniformity of action seemed impossible. Owens did it by departing wholly from the

glass blower as his model, and so doing, he left open to others, if they could, to make the methods of the glass blower, his gob forming and severing in suspension, their general guide in effecting mechanical reproduction.

This court in the case above cited called attention to the fact that in the window glass art many years of experimenting were required to bring the mechanical blowing of glass to successful shape. In some ways the problem of reproducing the work of a bottle blowing workman was an even more difficult problem, and we are not surprised that we have to go back as far as 1903 to find the beginning of the steps which culminated some years later in the device which mechanically did, the glass blowers' skillful work. When the change was made, its significance was at once recognized by the glass workers in words which were used by one president of the Glass Blowers' Union and repeated by another, as follows: "When the Owens automatic came into our trade it was believed that its almost human sense of operation was the last word in mechanism so far as the manufacture of bottles and jars was concerned, yet today we see machinery simpler in construction and much lower in cost coming into the trade that not only competes with the Owens automatic *but bids fair to supersede it*, at least upon some lines of ware; in fact, the question confronting us is: What will be the extent of this supersedure."

This new machine and its new and differentiating elements were tersely stated in such article as follows: *"Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received."*

We shall later see that in these few words this practical glass blower official summarized the novel characteristics of the machine which is the subject-matter of this suit. And be it observed, he notes the exact differences between Owens and this new machine. Owens uses a stream of flowing glass, which means high heat and great fluidity. The new machine uses a suspended gob, pre-formed during suspension and so pre-formed as to conform to mold shape, all of which means viscosity, nonfluidity, and less heat. It also notes that these things were done while the gob was *suspended*.

We turn to the proofs for the steps leading up to this development. About 1911 Karl E. Peiler, a mechanical engineer working under one William A. Lorenz, was assigned to investigate the bottle glass art, with a view to improving on the lung-blown glass jars used by a great food company and which were not satisfactory. It was found that they varied in weight and were not of sufficient good quality. These jars were made by a hand-gathering process. That there was an unsatisfied demand for improvement is clear. In Hartford-Empire Co. v. Kearns-Gorsuch Bottle Co., the master properly said: "In 1912, and for some years prior thereto, the situation in the glass manufacturing industry was such as to create a demand for the substitution of automatic glass feeding devices for the old hand feeding process. A great many applications were filed with, and numerous patents were issued by, the Patent Office, some practical and operative and many impractical and inoperative, covering automatic glass feeding devices." In disposing of the master's report, Judge Hough refers to the frenzied demand by the glass industry for the substitution of machinery for hand labor.

Peiler found in the art the Owens suction bottle machine and the flowing stream feed of Brooke. He found the stream feed had certain objectionable features and he made up his mind to turn away from the free stream with its great heat and its highly fluid properties and go back to a study of what the hand gatherer really did with viscous glass. That this step of Peiler was a proper step, we may say by way of anticipation, is shown by the opinion of the court below, which says: "The unsatisfactory results of *stream feeding* led to suspended charge or 'gob' feeding, an advanced form of which is illustrated by the device disclosed by the drawings of plaintiff's patent. By this method separated charges were successively fed to a series of molds. The glass being more viscous than that of the flowing stream, and the charge being a single mass of proper size for the mold, the laps and coils of the flowing stream method were eliminated and thus imperfections greatly reduced." He found that the viscosity and fluidity used by the hand gatherer were such that, as he testified, he "was able to hold a mass of glass on his pontil in adhesion with it, and that glass was at the right temperature for working, whereas my understanding was that the stream feed used—I was shown ware said to have been made by the stream feed, and it seemed very reasonable to me, from the

appearance of the ware, that the defects in the ware, which I noticed, were caused by the *action of the stream,* and in thinking the thing over I applied the principle which I had been fond of applying, that is, to swim with the current, and utilize the properties of the material in working with it, rather than to fight those properties. I therefore determined, after watching the hand-gathering operation, *to use the viscosity of the glass itself,* if I could, to produce a mold charge which could be fed automatically. That would give me, *if I used the proper viscosity* for feeding a mold charge, also a viscosity which would give the proper working condition when the glass got into the mold, as I found to be the case. I therefore tried some experiments. I gathered glass *on a hand punty*—if I may refer to an exhibit drawing, please. (Drawing produced, Plaintiff's Exhibit No. 8.) Referring to this drawing, I took glass just as the hand gatherer ordinarily gathered it, by putting his punty into the furnace. Now, the punty is hot, it is first heated, and the glass sticks to it— the glass would stick to any hot substance— as soon as it gets up to a certain critical temperature. Then by winding the punty, you gather a certain amount of glass on the end of it, and by turning it up farther to lift the punty, there is a thread drawn out, which is finally broken off and *wound up,* so that you get the mass separated from the glass in the furnace and on the end of the punty. Now the hand-gatherer ordinarily keeps his punty twirling, or reciprocating, so as to keep the glass on the punty until it gets over the mold, and then he stops temporarily, and slopes the punty a bit, and then the glass begins to sag off. Then he lowers it so that the glass gets into the mold, and another man shears the glass with the hand shears. That was the old hand art. Now I took this ball or mass of glass gathered on the end of the punty, and I kept it in the furnace, where it was hot, so that I could try these experiments repeatedly, and I kept turning the punty until a certain time, and then stopped the rotation, and observed what happened as the glass slumped down. In doing this, I used an assistant to turn the punty—he had it on a support, and I used a stop-watch, and I found the glass sagged down varying distances in varying times, and that if you didn't wait too long you could *pull the glass back* by winding the punty again, winding it up. I found that the longer you waited, the farther the glass slumped down, and also that it took certain typical shapes as it slumped down."

Peiler's first idea was to feed the glass through a submerged orifice, so that it could be alternately pushed out and drawn back, "but I couldn't at that time think of any practical way of doing it at that viscosity. I laid that aside for the moment, and went back to the punty idea. * * * This punty was to be operated mechanically and rotated periodically, so that it alternately rotated and stopped. * * * There were to be a pair of mechanically operated shears below the punty, meeting beneath it, to cut the glass far enough below the punty to be out of smearing relation to it, but near enough so as not to leave too long a stub. This use of the mechanical punty did not work out. The next idea was that of a paddle in the end of the forehearth, back of a spout something like a pitcher spout. This paddle was to be oscillated to force successive individual masses of glass over the spout lip suitable to form a mold charge and cause them to be suspended and then sever the charge or gob." This patent idea, as we shall see, developed into Peiler's patent No. 1,573,742, applied for November 25, 1925, and granted February 16, 1926, which is not here involved, but which, for reasons hereafter shown, it is necessary to consider in the evolution and history of the general art and of Peiler's experimental work. We should here remark that Peiler's protracted experiments were carried out in a practical way. He had a small building specially constructed for the purpose in the city of Hartford, where he had all the apparatus for fusing and blowing glass. The accompanying cut, which is figure 39 of the paddle feeder patent, shows the general features of his paddle wheel device on figure 9 of the patent as appears on page 7 of appellant's brief:

The paddle A forced surges of viscous glass B over a dam C at the end of a spout, and the gob thus formed was severed in suspension from each hanging and on-com-

ing mass by the shears D. That in operation of the paddle device the functional or cutting operation of the shears in no way supports the molten glass, but the glass is cut while in suspension, just as it comes down from the punty, is clear. This is pointed out by Judge Thomas in his enlightening opinion found in Homer Brooke Glass Co. v. Hartford-Fairmont Co. (D. C.) 255 F. 901, 904, affirmed in (C. C. A.) 262 F. 427, as follows: "After the predetermined quantity of molten glass is thus forced or pushed over the dam, the gather or batch is cut off by means of knives coacting and quickly severing the gob, and these knives in no way support, or even tend to support, the molten glass as it is severed by the knives, so quick is their operation. * * * 'The gob, pre-formed as a gob, is automatically cut off from the mass hanging from the spout as, prior to Brooke, it had been automatically cut from the mass hanging from the punty.'"

In the practical work of that part of the glass-blowing art here involved, we regard Owens and Brooke as the only devices which caused any concern to the Glass Blowers' Union. Whatever steps other inventors took, certain it is they had no effect so far as supplanting hand blowing by machine blowing. Accordingly, we take these Owens and Brooke devices as constituting the advance of the art in the machine glass blowing of bottles. Moreover, it is clear that Brooke's device was not satisfactory, for, as the court below properly held: "Hand feeding was succeeded by stream feeding, by which *a stream of very hot, and consequently quite liquid,* glass was allowed to flow from an orifice in the furnace into a mold, or into a combined husbanding and shearing device, and thence into a mold, the portion of glass in the husbanding device being followed by a stream flowing directly from the furnace to the mold. After the proper quantity had been deposited, the stream was cut and intercepted by the shear container and the operation repeated. This method is illustrated by Brooke patent, No. 723,983, issued in 1903. *It had a number of defects.* The hot liquid glass, when exposed to the air, formed a skin, or enamel, upon its surface, in consequence of which, when the coiling stream of glass fell into the husbanding device and the mold, there was an imperfect coalescence of the laps of the stream and occasionally air bubbles were infolded. The laminations and defects thus created in the mold were repeated in the finished article."

Turning back then to Peiler's paddle patent construction, it is clear that the main essential features thereof are three: First, he uses, and has to use, molten glass of much lower temperature than in the stream feeding devices of Owens and Brooke. This superviscous glass, while it was the practice in hand blowing, yet it was a departure from the art's practice in attempting to obtain mechanical feeding as exemplified in Owens' and Brooke's. Such viscosity as Peiler used was necessary in order that the gob should have the necessary, and only the necessary, period of suspension at the spout mouth to permit timely shearing and thereby preclude the formation of a slender tadpole tail. Second, the use of the paddle to effect single, individual, pulsating, timed discharges of viscous glass of predetermined quantity so as to form a compact suspended mold charge. Third, timing and co-ordinating the shears with the suspended gob discharge, so as to shear the hanging gobs in suspension and before they rested on any support.

It will thus appear that as soon as the unformed but individual mass of glass is shoved over the dam by the paddle, gravity at once takes control of the glass and causes it to stretch down and elongate to a desired length for timely shearing It will be noted that gravity had effect when the paddle wheel had pushed the glass over the dam, but the paddle wheel, when retreating, had no effect on gravity or the spout-suspended gob. While gravity was stretching one charge, the paddle wheel was preparing to push forward a succeeding charge. This is clearly stated by Judge Thomas in the cases cited, wherein he says: "A longer or shorter time may elapse between the delivery of the paddle-dipped glass to the spout and the severing thereof below the end of the spout, so that without change of weight of gob, if a relatively long time elapses, the gob will be long, and if a short time elapses, the gob will be short." While, as we have said, this patent is not here involved, yet its device, the demand it met, the installation of the device, its commercial and mechanical success are all factors which must be understood and appreciated in order to give due effect to the patent of Peiler in suit, which, in addition to its own capacities, was also an improvement over the paddle wheel device and capable of conjoint use therewith. The paddle-wheel device proved successful. It was installed in April, 1915, and the uncontradicted proof is "the use of this original paddle-feeder was successful. We had to turn away customers at the beginning. About thirty paddle-feeders were put out by the plaintiff or its predecessor in this country."

But it will be noted that there was a limitation in this paddle device, or at least one step of operation and one desired function lacking, namely, this, that in it the glass was only supported from one side. In that respect Peiler testified: "Now, there was one disadvantage to this paddle idea, and that is that the glass was only supported from one side. It formed a one-sided unfolding action, the glass coming over, hanging there for an instant, and then unfolding down the front, stretching a little more on the front than on the back, and it gave a mold charge which was *oval*, in cross-section. In other words, it was not *symmetrically supported*, and could not be formed *truly round*, as it was formed ready for severing."

This disadvantage Peiler sought to overcome by getting a symmetrical discharge, and to effect this he turned to the use, in connection with a plunger, of a submerged orifice, which had the advantage of supporting the glass equally all around and giving a symmetrical discharge. But this involved several difficulties. It is apparent that if you take an orifice and a container of molten glass and start the glass through the orifice, it will issue with a nicely rounded end; but as more glass discharges, it will form an enlarged globular portion and a more slender portion between the globule and the orifice. As the discharge continues, the weight of the globular lower portion pulls the gob rapidly away so that you get the tadpole form, and if a mold is set to catch that glass as it comes from the orifice, the lower globular portion would have been received in the mold, but the glass would continue to flow down into it, coiling up and lapping on itself unless there was some way of stopping it. In that regard Peiler's testimony is: "I didn't want to have that part of the operation. I wanted to have the first part, and cut the glass in a compact mass, without having the disadvantages of this coiling." It is also clear from the proofs that the orifice, operating alone, is ineffective and involves other difficulties. The sides and bottom of the container and of the orifice exert a chilling influence, so that they both become lined with a layer of relatively cooled glass, with the result that as the glass issues, it is covered on the outside with a skin or sack of colder, more viscous glass, so that coils form in the mold, make lap marks, weld imperfectly, and also form chilled spots where the gob touches the walls of the mold.

Confronted by these difficulties, Peiler testified the idea came to him that by *pulsating* the discharge through the orifice, he could *accelerate* such discharge so as to cause the glass to come down when it was wanted and *retard*, or even *reverse*, the discharge when it was not wanted. Now it is clear that if this could be done, one could deliver gobs of proper shape and of sufficient glass quantity, and in suspension, and in synchronism with shearing and the presentation to the molds. Finally he evolved the use of a pulsating, vertical plunger which by its pulsation would either *discharge* or *retard* the glass as desired. By this use of a pulsating, vertical plunger so synchronized that the initial discharged mass or gob was held in *suspension* while there was fed into its upper end glass hotter and more fluid, whereby the gob's viscous skin surrounding was evenly expanded on all sides to the desired mold shape and then the flow of glass was stopped, the gob sheared, and the glass at the orifice withdrawn so as not to smear the shears. The periodic, separated, individualized mold forms or gobs discharged by this current-intercepted process and its contrast with the continuous feed stream of the earlier art are described by the union official just referred to in language we now repeat and whose keen accuracy will be better appreciated from what has been shown in the intervening part of this opinion. Accordingly we repeat his words: "*Instead of employing a stream of glass which collected in the mold until the desired mold charge had accumulated, these new feeders cut off a suspended chunk or gob of glass which was pre-formed during suspension to correspond, to some extent, at least, to the shape of the mold cavity in which it was to be received.*"

It will thus be seen that from a patent standpoint, the development of the two devices—paddle and plunger—were progressive steps in a connected and interrelated development of the gob-feeding art, and, while the paddle was earlier in date and could be used separately, it was quite evident that the plunger form, while it could be used separately, was also adapted to be annexed to, co-operated, and combined with the paddle device as an improvement thereon and was so interrelated with it, both in origin and operation, that in one sense of the word we can say the final development of Peiler's plunger device was bottomed on the work done by him in the invention of the paddle device, the result of which was that patents for each of the devices were applied for on the same day, the one resulting in patent No. 1,573,742, for the paddle device, and the other in patent No. 1,655,391, granted January 23, 1928, for the plunger device

here involved. We here note that the worth of Peiler's plunger device was recognized by the trial judge below, who says in his opinion: "The unsatisfactory results of *stream feeding* led to suspended charge or 'gob' feeding, an advanced form of which is illustrated by the device disclosed by the drawings of plaintiff's patent. By this method separated charges were successively fed to a series of molds. The glass being more viscous than that of the flowing stream, and the charge being a single mass of proper size for the mold, the laps and coils of the flowing stream method were eliminated and thus imperfections greatly reduced."

Its novelty was recognized by such an able and experienced man as Judge Hough, who said in Hartford-Empire Co. v. Kearns-Gorsuch Bottle Co., and The Lamb Glass Co.: "Prior art exemplified by many patents is urged. An examination of these patents show many of them to be in no possible way connected. Harding, and Morrison, and Brookfield, and perhaps a few others, may be said to have similarity. The French patent, Wilzin, has one or more elements in common. None of them, however, include the entire series of elements contributing to the time relations that result in the useful combination that has been conceded to Peiler."

So also Peiler's differentiation from stream devices such as Brooke's, and consequently Owens', was recognized by Judge Thomas in the case already cited, where he says: "The evidence is conclusive that the Brooke cutting device and the defendant's machine are radically different in theory and in operation, and they certainly are in no way similar in appearance or operation. * * * The engineering is along different lines. It avoids the theory adopted by Brooke. It does not treat a 'stream'—'a flowing stream'—a 'continuously flowing stream.' It deals with a separate entity, and that entity is the batch which is pushed over the lip of the dam by the paddle in its downward, forward, and backward movement in performing the work which devolves upon it. The severed mass then finds its way, by force of gravity, through a trough to the proper mold, where it is pressed into whatever article is being manufactured."

The plunger device was recognized by the glass art and licenses were issued. Indeed, the Owens Company recognized its worth by becoming a licensee, and the proof is that it went into extensive use, "more than 120 having been installed in the United States and in foreign countries. The average total productive capacity of these paddle-needle" (the name given to these plunger devices under the trade name P. N.) "feeders that have been licensed or sold is about 2,020,-000,000 packed articles per year."

The urgent demand of the art for feeders on Peiler's two devices is shown by the proofs: "The use of the original paddle feeder was successful. We had to turn customers away at the beginning. About thirty paddle feeders were put out by the plaintiff or its predecessor in this country." It is further shown that seventy-five of the P. N., or patent needle, feeders were installed, and the proof is "that a large number of these, somewhere near twenty-five, were attached or formed from rebuilt paddle-feeders; that is to say, there were about thirty paddle feeders in operation at the time this P. N. feeder was put on the market, and some of those were converted, and further P. N. feeders were manufactured independently at Hartford, so that we had a total of seventy-five finally placed out commercially. * * * They" (the P. N. devices) "were more successful than the paddle feeder, and they gave all the necessary control of shape, weight and viscosity."

And the proof further is, and we find no contradiction thereof, that it was not until "after the commercial use of the plunger in the Hartford paddle-needle feeder, that any competitor applied a *plunger to its feeder.*" Indeed, the radical step Peiler's needle plunger device made in the art over Owens' stream device is shown by the fact that by the latter's $80,000 machine a product of 110,000 bottles per day was turned out, while Peiler's needle-plunger machine costing $13,-000 could turn out the same number of bottles. This extraordinary advantage of Peiler's needle-plunger device over the pioneer device of Owens, which had in its own day revolutionized the trade, was recognized by the Owens owners, who found themselves compelled to seek relief by acquiring licenses. In that respect the record shows: "This combination resulted in a completely automatic bottle making unit, which brought about an actual competitive condition that forced The Owens Bottle Company to itself enter this field and to expend upwards of a million dollars in the acquisition of patent rights and in designing, building and using gob feeders and forming machines adapted for use in combination with these feeders. In this connection and upon the advice of counsel, it purchased license rights under the

patents and applications of the Hartford-Empire Company, successors of the Hartford-Fairmont Company, including the Peiler application here concerned."

Indeed, our study of the art satisfies us that no one prior to Owens and Peiler made any real, adopted, practiced improvement in the machine bottle blowing art; that all others produced no such working, practical combinations as these two men; that Owens' and Peiler's devices were on radically different lines—Owens in stream feed with high fluidity and high heat, Peiler's in forced feed with nonfluid viscosity and lower heat. In this view of the work of the two men who, and who alone, in our opinion, changed the bottle art from lung blowing to machine blowing, we feel the proof made in the patent proceedings, "The Owens Bottle Company now employs plunger gob feeders, largely of Hartford-Empire manufacture, in three of its factories, and its more recent installations have all been of this character. It has been forced by the hard facts of actual commercial competition to recognize that the gob feed method of bottle manufacture represents a radical and distinctive advance in the art, second only in importance, to the revolutionary achievements of the Owens bottle machine, and to recognize Karl E. Peiler as an outstanding figure in this extraordinary development. To my personal knowledge, the late M. J. Owens accorded to Mr. Peiler the principal credit of this advance," justly describes the indebtedness of the art to these two men.

The conclusion we reach from such estimate as a court, necessarily without practical knowledge or experience in actual glass working, can make of a working art, not only finds support from the attitude of glass blowers' unions and factory owners who were experienced and vitally interested in the art, but also from those whose work required them to study and inform themselves in the glass-blowing art. In that regard we make brief extracts from two significant sources. The German work of Dralle & Kepeler, entitled "Die Glasfabrikation," Edition 1923, says: "This idea *of allowing the glass in the furnace to become so viscous that the entire mold charge may be accumulated in a mass at the outlet of the container and by cutting it off may be delivered as a unit* to the mold, shows by its result that it was extraordinarily fruitful and proves after a long period of test and experiment to be the beginning of a satisfactory solution of the feed problem."

It will be noted that the reference to vis-cosity, "The idea of allowing the glass to become so viscous"; the reference to gob forming and feeding, "that the entire mold charge may be accumulated in a mass at the outlet of the container"; the gob shearing, "by cutting it off may be delivered as a unit at the mold"—these all refer to elements in Peiler's needle-plunger device. And the recognition of the originality of such practice and the long experimentation to secure it "shows by its result that it was *extraordinarily fruitful* and after a long period of test and experiment" confirms our estimate of Peiler's work.

Nor was this recognition of the worth and novelty of Peiler's device confined to this country. At the annual meeting of the British Society of Glass Technology held at Sheffield in 1925, its president in his presidential address said: "It was, I am quite sure, from these developments of the Hartford-Fairmont Company that the idea of the present principle of 'gob' feeding originated, for soon thereafter many gravity feeding devices began to appear with means employed, through an oscillating plunger in the feeding boot, to deliver a definite and predetermined charge of glass shaped as near as practicable to that of the parison mould."

From this it will be seen that in England, as well as in Germany and the United States, Peiler was credited with originating "the present principle of 'gob' feeding"; that it was effected by his plunger oscillating so as "to deliver a definite and predetermined charge of glass," which was shaped as near as possible to that of the parison mold; characteristic features of Peiler's plunger.

As we have said, the paddle devices were built by the plaintiff company and installed and leased to a number of companies. When the plunger device was completed, it was quite manifest that its work was an improvement on the paddle device and adapted to be used with it, but the plaintiff, instead of forcing the plunger device separately on the trade, and supplanting the paddle devices which the plaintiff itself owned, took the wiser course of persuading the users of paddle devices to add to its mechanism the plunger device and thereby improve it. When this was done, the paddle device simply became a preliminary feeder to the plunger chamber, and the whole operation of forming the gobs, holding them in suspension, and shearing them, was done by the added plunger apparatus. It is also apparent that when they leased a plunger device, there was no need, if such lessee preferred a plunger de-

vice, of having the added expense of accompanying it with a paddle-feeding device. The proofs show that the plunger machine went into extensive and successful use. There was no advertising, no selling campaigns. Its merit sold the machine itself. Its cost, as compared with an Owens $80,000 bottle machine, was about one-fifth.

In his application for the grant of the patent in suit, Peiler, in language and in figures that, be it noted, were not changed during the prosecution of the application, set forth clearly the defects of the practical art, and by what means he overcame them. Referring to what he had in view, Peiler describes (the italics are ours) the objectionable features of the old art as follows:

It is a prominent characteristic of molten glass, that when it issues or is withdrawn from the furnace or container, and is exposed to the colder surroundings outside of the furnace, it acquires a partially chilled surface or skin, known in this art as 'enamel'. This enamel is coldest and stiffest on its outer surface, and gradually merges into the hot and more plastic interior of the glass. When a charge of this glass is delivered to a mold, any undue stretching, rupture, or infolding of the enamel will cause defects in the article being made. Any trapping of air by the glass, due to lapping or folding of the surface of the glass as it is delivered to the molds will also cause defects. To avoid these defects it is desirable to *pre-form* the mold charge, before it enters the mold, so that its external contour will *closely approximate* the interior contour of the mold walls, or at least that portion of the mold which receives the gather. This is of special importance in the making of blown glassware. A mold charge which is to form a narrow necked bottle, for example, should be *preformed as an elongated cylinder with a tapering end,* so that its *entire* surface may as nearly as possible *contact equally* with the mold walls for the same length of time. Unequal contact of different portions of the surface, or unequal duration of contact of different portions tends to produce an unsymmetrically chilled and enameled blank or parison, which will not blow out uniformly, because the hottest portions will *stretch more* than the cooler portions, resulting in a poor bottle having a wall of *uneven thickness.*

"These conditions have evidently been recognized to some extent by the *hand gatherer,* practicing his ancient art, who by manipulation of his pontil or gathering rod during the gathering operation *pre-formed his gath-* er or mold charge, as well as he could by this primitive method, to fit the mold, or that portion of the mold that receives the gather, thus attempting to avoid undue deformation of the mold charge when deposited in the mold. *On the other hand,* these conditions have received little or no attention in the gathering or feeding of molten glass as *heretofore practiced by machine* or other automatic methods."

He then describes what his device accomplishes, as follows: "The present invention accomplishes this *preliminary* shaping of mold charges with greater ease and exactness than heretofore by the *adjustable* operation of suitable *impelling* means coacting with an orifice below which the mold charges are accumulated and *suspended,* and it employs the elongation of the *suspended* charges in *controlling their shape.* It also makes use of *coaction* between the *impelling means* and suitable *severing* means, convenient adjustments being provided to allow *control* of the severing means and impelling means as to *relative time of operation, speed and position.*"

He then describes how the charges are formed by what he terms an "impeller," as follows: "The molten glass flows from the glass furnace 1 through a channel or conduit 2 (Fig. 2) to an outlet 3. It is there acted upon by an *impeller* 13 mounted for *vertical movement,* and provided with *various adjustments.* As it issues periodically in regular cycles from the outlet, it forms successive gathers from which mold charges are severed by shear blades 4 reciprocating *below the outlet.* The separated mold charges fall upon a moistened chute 5 and slide upon it to the molds 6 mounted on the table 7 of the associated shaping machine (Fig. 5)."

He then refers to the different actions of the impeller in forming different shapes, as follows: "The various characteristics of the impeller action may be varied, and its operating period may be *advanced* or *retarded* relative to the *severing action.* * * * By using appropriate sizes of outlet ring and impeller and by proper setting of the various adjustments, the shape of the *top, body* and *lower end* of the mold charge may be varied separately at will as hereinafter described." And notes some such variations, as follows: "As the impeller moves upward it gives an upward or intrusion impulse to the glass within and below the outlet. The intrusion impulse opposes the gravity head at the outlet, tending to retard the discharge of glass from the outlet, and may be made

to reverse the motion of the glass within and below the outlet, raising it up to an extent depending on the extent and strength of the impulse."

He then describes how the upper end of the suspended gob may be swelled or, as he describes it, "the diameter of the suspended and elongated glass" increased by the downward movement of the impeller, as follows: "The downward or extrusion impulse of the impeller may be used to control the shape of the body and *upper end* of the gather and its resulting mold charge. The impulse tends to increase the diameter of the *suspended* and elongated glass, in proportion to the extent and strength of the impulse." He then points out how by certain mechanism the extruder may "increase the diameter of the *body of the gather* rather than the diameter of the *upper end only;*" or it may, by certain changes, "tend to enlarge only the *upper end* of the gather," or, by another adjustment, "enlarge more of the gather, as for instance, *both the body and the upper end.*" He also notes that the impeller may be varied, viz., "a larger or blunter impeller also gives a stronger impulse." He likewise points out that the effect of gravity in diminishing the diameter of the descending charge may be overcome, viz., "The *decrease in diameter* of the gather due to its elongation by gravity may thus be compensated for to any extent." Holding as we do that the invention and disclosure of Peiler consisted in using a plunger for stuffing gobs in suspension to shape and then straining such shaped gob in suspension, his specification sufficiently discloses what his alleged invention was and instructs the art how it may practice the same.

Now an orifice at the bottom of a container of molten glass was not in itself new; shears were not new; gobs formed to shape; all these in isolated form were old. The suction effect of a plunger and its impelling charging capacity were, of course, old. But the test of the inventive character of this combining, co-operating device is not the nonexistence of its separate elements, but whether any one has previously used them in combination to effect the same functional purposes as the patentee. We do not deem it necessary to discuss the patents where plungers are shown or where orifices are shown, or where shears are shown. The art is full of such uses, but neither the practical art in its use, nor the Patent Office, the court below, nor this court has found anywhere a prior patent or device which embodied Peiler's combination of elements as embodied in the patent in suit, or of those of its sister patent No. 1,573,742 for the paddle construction. In that connection we deem it proper to note that while the two patents have much in common and the Patent Office might well have included them both in one application, yet the two involve distinctive differences and separate though corelated inventions.

In the paddle type we have an open, unrestricted body of glass as compared with the restricted glass body in the intruder chamber. Second, in the paddle-device control, the charge and any effect thereon by the paddle ends when the paddle delivers the *unformed* body of glass at the mouth of the chamber, for the glass as delivered by the paddle at the spout has taken no gob shape. On the other hand, in the intruder or plunger type, the glass is restricted by the chamber wall surrounding the plunger. When the extruder descends, it delivers a formed mass in the shape of a gob at the mouth of the orifice, and after that the extruder, by its downward stroke, continues its effect on the gob by swelling it while in suspension and by its backward stroke, the extruder, or plunger, continues its effect on the gob by counteracting the effects of gravity and helps hold it in *suspension* until the gob is formed to desired shape and sheared. It is clear, therefore, that the difference between plunger and paddle treatment result in two different products—in the paddle product a gob whose semicircumference only is treated, in the plunger a gob whose whole circumference is treated. In the paddle device a commercially satisfactory product was produced; in the plunger a perfect product was the result.

Moreover, it will be observed that the patent does not seek to blanket the art by a combination of plunger and shears, but what it does claim as its right is the combination which includes the use of a plunger to swell and shear a charge while in suspension. By such combination use of old agencies Peiler for the first time mechanically, and without human work, furnished to the mold a charge closely approximating the contour of the mold and with an enveloping skin or covering of even thickness and low viscosity. He made a substantially symmetrical distribution of temperature and viscosity up to the instant of delivery to the mold.

This court, in Skelly Oil Co. v. Universal Oil Products Co., 31 F.(2d) 427, 431, laid

down what an alleged anticipation should show to defeat a patent: "A patent relied upon as an anticipation must itself speak. Its specification must give in substance the same knowledge and the same directions as the specification of the patent in suit. Otto v. Linford, 46 L. T. (N. S.) 35, 44. It is not enough to prove that a method or apparatus described in an earlier specification can be made to produce this or that result. Flour Oxidizing Co. v. Carr & Co., 35 R. P. C. 457. A singularly sensible test of the rule of anticipation is given in British Thomson-Houston Co. v. Metropolitan Vickers Electrical Co., 45 R. P. C. 22, by asking the question—'Would a man who was grappling with the problem solved by the patent attacked, and having no knowledge of that patent, if he had had the alleged anticipation in his hand, have said: "That gives me what I wish?"' The Pope Alliance Corporation v. The Spanish River Pulp & Paper Mills, Ltd. (Privy Council Appeals No. 33 of 1928)."

We are therefore warranted in refusing to strike down this patent on the strength of alleged anticipations which absolutely did not disclose Peiler's device or tell the art how to produce the product with which he has swelled to great output in a great industry. In point of fact, the independent operators who were threatened with annihilation by the Owens device, found nothing in this swarm of alleged patent anticipations to relieve them, and the labor conventions asserted, as they did, that none of these alleged prior devices had any effect. We may safely assume these futile devices did not enter into the situation then and should not now, because their worth and alleged pertinence is based on fiction without support of fact. Measured by the test laid down by this court, we find nothing in the prior art which did, or even suggested doing, what Peiler discovered only through prolonged effort and much experimenting and which was approved by use, while several devices made by him during his experimentation proved worthless on test.

While it may be repetition, we deem it proper to add that, holding as we do, the gist of Peiler's patent is, as above stated, a device which, A, produced a gob pre-formed in suspension; B, a plunger which stuffed or swelled the gob, while in suspension, to approximate mold shape; C, a device which sheared such shaped gob when suspended.

█ But the defendant contends that the patentee and the plaintiff realized that Peiler "was not the first inventor of the method of forming mold charges in suspension (while hanging freely) with the aid of a vertically reciprocating plunger (body of material) and of shears spaced below the orifice," and that this is proven by the disclaimers filed by them.

We cannot agree to this contention. When the application for the Peiler patent was filed, Peiler's plunger feeder had been in commercial use at Fairmont for over a year. The Patent Office suggested to Peiler and to others who had filed applications for patents in the glass-making art the claims which Peiler later abandoned. These suggested claims were put into one or another of the patents including the patent in suit. This resulted in ten interferences involving twenty-three counts, three of which are quoted by the District Court, but not one of them originated in the Peiler application. Each one of the claims relinquished was drawn to fit and disclose some structure other than and functionally different from the structure of the Peiler patent.

A disclaimer must be read in the light of the application in which it originated. Some of the disclaimers in question were drawn upon, and were peculiar to, a structure having a stationary tube extending down into the glass to a position at or below the orifice; others originated in the Howard reissue application of 1916 in which there was no reciprocating plunger, but had in lieu thereof a stationary air tube projecting through the outlet; other counts were drawn upon and were peculiar to the device in the Bridges patent whose plunger or "punty in its downward movement through the bath of glass is not intended to assist the flow of glass through the orifice," for "the downward speed of the punty will preferably not exceed the speed or gravity drop of the molten glass." In short, no interference abandoned by Peiler was directed to the combination or method of the patent in suit.

It is a settled rule of law that a disclaimer filed under such circumstances as exist in this case must be restricted to the particular matter of the claim relinquished. Reed v. Cropp Concrete Machinery Co. (C. C. A.) 239 F. 869; Remington Cash Register Co. v. National Cash Register Co. (D. C.) 6 F.(2d) 585; Standard Co. v. Cropp Concrete Machinery Co. (C. C. A.) 256 F. 666. When the disclaimers filed by Peiler are interpreted in relation to the patents in which they arose and the particular devices upon which they were drawn and to which they related, it is

clear that neither Peiler nor the plaintiff relinquished the particular combination constituting the invention in the patent in suit.

Now not only does every prior patent fail to show Peiler's combination, not only can such patents be used without infringing Peiler's claims, but it is clear that the glass art, which was frantic to get some machine to free them from Owens' domination, saw nothing in any of these prior patents, either in instruction or even suggestion, to enable the art to discover such a path as Peiler hewed out, much less, even by implication, to suggest such a path. And where an art, eager for relief, found in these moribund patents nothing to meet that suggested solution, it is safer to rely evidentially on the then judgment, attitude, and conduct of the glass trade rather than on the post litem testimony of experts, the contentions of infringers, and the theoretical construction that often tempts courts to create out of lifeless patents an imaginary machine on paper which a working art could not do in steel.

We deem it necessary to refer only to claims of his patent which fully protect his device. They require neither a stretched nor a restricted construction. They are perfectly plain; they simply mean what they say. They either lay themselves on defendant's machine or they do not. There is no ambiguity in them and hence no call for construction to ascertain their meaning. They correspond with, and were meant to protect, the disclosures Peiler made in his original application. The statements he therein made he persistently maintained in the patent proceedings. He has never abandoned nor qualified, and in accord with such statements his patent was granted and the claim in question granted.

Now as we view the defendant's device, it differs from Peiler's preferred form only in the mechanical means used to actuate and control its extruder. The pertinent element of apparatus, claim 8, is "means for so moving the implement downwardly during the issue of each mold charge, and upwardly after the issue of said charge, that each charge will be produced and selectively shaped in suspension by the movement of the implement." True, Peiler showed a particular mechanical construction for so doing, but the Patent Office, in granting this claim, did not restrict it to the particular mechanical connecting Peiler showed, but protected that element in a broader and more generic character, to wit, "means for moving," etc., and thereby meant to include any mechanical

equivalent of the particular means Peiler showed. Obviously the compressed air means the defendant uses is but a mechanical and functional equivalent of Peiler's means and an engineering alternative. Valuable inventions are not to be filched by an infringer's use of optional, alternative forms which in the end effect the same plunger movement, which is the same in Peiler's and the defendant's device.

So regarding, infringement is clear. The decree below which held there was no infringement is reversed, and the record is remanded, with instructions to enter a decree holding the plaintiff's patent valid and the claims sued on infringed, and directing an accounting.

We may add that since this opinion was drafted our attention has been called to the comprehensive and learned opinion of the Chancery Division of the High Court of Justice in Peiler's British Patent. A study of that opinion has not changed our holding as above set forth, and without entering into a discussion thereof, which might seem presumptuous, we only add that while there may be differences of opinion in courts as to the worth of Peiler's invention, we feel strengthened in our conviction that Peiler made a notable contribution to the art, by the statement of the president of the practical, working art in England as embodied in the Sheffield address already quoted.

WOOLLEY, Circuit Judge (dissenting).

I do not find the bottle glass art so barren of invention as the court indicates in its opinion. Between the time of man-blowing methods and the patent in suit there were at least fifteen patents covering a glass bath in which a reciprocating plunger operated to accelerate and retard the flow of molten glass through an orifice and, in some cases, to form a gob suspending from the orifice, then to be cut off and transferred to a bottle mold. These elements constitute the main structure of the apparatus of the patent and embody its primary function. In adopting and combining them Peiler, so far, did nothing even remotely inventive. He simply took them and used them as he had found them.

Besides these inventions there were many more, as is shown by the fact that it is admitted or conclusively proved that all elements of the patented apparatus were old with the possible exception of means for varying the speed of the reciprocating plunger in its descent. This variation in the stroke of the plunger, effected by an adjustable

cam arrangement, is what gives pulsations to the flow of glass through the orifice, which in turn, by proper timing, give a selected shape to the gob, the final function of the apparatus and method. This variation in the stroke of the plunger and in ·the discharge of ˙molten glass resulting, as the variation is pre-arranged, in a gob of any desired shape, is the pith and marrow of the invention. Even this was not adjudged patentably novel by the Chancery Division of the High Court of Justice in construing and holding invalid the claims of Peiler's British Patent. British Hartford-Fairmont Syndicate, Limited, v. Jackson Bros. (Knottingley) Limited, decided January 21, 1932. Assuming however, contrary to the English decision, that the element of a plunger, variously named in the claims, is broad enough to include a plunger with a stroke of variable speed which thereby extrudes glass through the orifice in varying mass and gives it a selected shape while suspended, and assuming also that this was new and for that reason the whole apparatus or method is an invention, it is certain that the alleged infringing apparatus of the defendant, also having a prior art plunger, does not operate with the Peiler graduated plunger stroke and, in consequence, does not selectively shape or pre-form the gob at the orifice. It has the old plunger stroke of one speed, regulated as before with reference to the weight of the gob, not to its shape, except, of course, that it be small enough to pass into the mold. The patent makes no claim of regulating size apart from shape.

The only shaping of the gob by the defendant's machine is that effected by a false ring, positioned many inches below the orifice and shears, through which the˙gob after it has been´severed from the orifice drops on its way to the mold. This shaping, such as it may be, is by an altogether different means in an altogether different place from the shaping means and place of the patent.

Regarding as undisputed the evidence on the different ways in which, as briefly stated, the plungers of the two apparatus operate, it follows that the straight stroke plunger of the defendant's machine does not, and cannot, give to a gob the shape which a plunger with a variable stroke will give it, and therefore does not infringe. If this is not true, then it is because the advantages and functions of the new variable stroke of the plaintiff's prior art plunger do not exist; or, if existing, they are equally present in the old straight stroke of the defendant's prior art plunger, and therefore the claims

are invalid. So, in my view of the case, the claims are either invalid or not infringed. There is no other choice. Finding against infringement and approving the decree dismissing the bill [39 F.(2d) 111], I am constrained to dissent.